## McCutcheon v. State of Indiana.

[No. 25,224. Filed March 9, 1927. Modified and rehearing denied June 9, 1927.]

1. CRIMINAL LAW.—*Review of capital conviction should be made with the utmost care and consideration.*—Great care should be taken in reviewing a conviction in which the death penalty has been imposed and all points raised or attempted to be raised should be given consideration. p. 250.

2. CRIMINAL LAW.—*Failure to withdraw count of indictment charging premeditated murder not prejudicial where charge of murder while committing robbery was clearly proved.*—In a prosecution for murder, based on an indictment in two counts, one charging the killing with premeditated malice and the other that the killing was done in an attempt to commit robbery, both defined by §2412 Burns 1926 and punishable by the same penalty, although there was no evidence to sustain a conviction on the first charge, the failure of the court to withdraw the count charging premeditated malice would not prejudice the defendant where the allegations of the second count were clearly proved, as each count charged the commission of the crime of murder in the first degree. p. 254.

3. CRIMINAL LAW.—When one count of an indictment is insufficient, a general verdict of guilty will be presumed to be based upon the good count. p. 254.

4. HOMICIDE.—*Malice may be presumed from the use of a deadly weapon in such manner as to cause death.*—The intentional use of a deadly weapon in such manner as to cause death authorizes the presumption that the defendant acted maliciously, unless such use was in necessary self-defense or on a sudden heat occasioned by adequate provocation. p. 255.

5. HOMICIDE.—Purpose to kill may be inferred from the use of a deadly weapon in such manner as will likely produce death. p. 255.

6. CRIMINAL LAW.—*Instruction defining murder in first and second degrees and manslaughter not erroneous because of stating the penalty for murder in first degree and omitting it from the others in view of final instruction.*—In a prosecution for murder, an instruction defining murder in the first degree, murder in the second degree and manslaughter was not erroneous because of stating the penalty for first degree murder and omitting it from the others, in view of final instructions stating the penalty for both first and second degree murder and informing the jury that the penalty for manslaughter was fixed by law and was not determined by the jury. p. 255.

7. CRIMINAL LAW.—*Instruction that jury could convict defendant only of such degree of homicide "as you have no reasonable doubt of his innocence" held not prejudicial.*—In a prosecution for murder, an instruction that the jury could find the defendant guilty only of such degree of homicide "as you have no reasonable doubt of his innocence," although awkwardly worded, was not prejudicial to the defendant because of the use of the word "innocence" for "guilt," in view of a subsequent instruction and the fact that the undisputed evidence showed first degree murder. p. 255.

8. CRIMINAL LAW.—*Erroneous instruction may be corrected by giving correct instruction if the two are not inconsistent.*—The rule that an erroneous instruction cannot be corrected by giving a correct instruction is applicable only where the two instructions are inconsistent, thus producing uncertainty in the minds of the jurors, but error in an instruction may be corrected by giving a correct instruction if the two are not inconsistent. p. 255.

9. HOMICIDE.—Intent is not a necessary element of murder committed while perpetrating a robbery. p. 257.

10. HOMICIDE.—*Instructions as to second degree murder and manslaughter held unnecessary when evidence clearly showed murder while perpetrating robbery.*—In a prosecution for murder while perpetrating a robbery (which constitutes murder in the first degree), the evidence of guilt was so conclusive that instructions as to second degree murder and manslaughter were unnecessary. p. 257.

11. CRIMINAL LAW.—*Refusal of new trial for newly-discovered evidence tending to show insanity not error when no plea of insanity interposed.*—Where no plea of insanity was interposed, it was not error to overrule a motion for a new trial on the ground of newly-

discovered evidence tending to show insanity, as such evidence would be inadmissible under the issues as formed in the cause and existing at the trial, and it is only in extreme cases that the courts will grant a new trial in order that new issues may be formed. p. 257.

12. CRIMINAL LAW.—*New trial granted only in extreme cases for purpose of forming new issues.*—It is only in a very extreme case that a court is charged with the duty of granting a new trial in order that new issues may be formed. p. 257.

13. CRIMINAL LAW.—*Newly-discovered evidence of mental and moral deficiency and unaccountability held insufficient to justify granting new trial in prosecution for murder.*—In a prosecution for murder, a new trial for newly-discovered evidence tending to show insanity was properly refused where the newly-discovered evidence merely showed that the defendant was mentally weak and deficient, and morally delinquent, is a moron and has no self-control, as such evidence would not tend to show that the defendant was an insane person with no sense of right and wrong. p. 259.

14. CRIMINAL LAW.—*Death penalty for murder is not cruel and unusual punishment.*—The provision of the Constitution that "cruel and unusual punishment shall not be inflicted" (Art. 1, §16, §68 Burns 1926) is not violated by a death penalty for murder in the first degree. p. 260.

15. CRIMINAL LAW.—*Death penalty for murder is not vindictive so as to violate Constitution.*—Punishment of death for murder in the first degree is not in conflict with Art. 1, §18 of the Constitution to the effect that the penal code is founded on "the principles of reformation and not of vindictive justice" (§70 Burns 1926). p. 260.

16. INFANTS.—*Youth 16 years old capable of committing crime.*—A youth sixteen years of age who knows the difference between right and wrong and understands the nature of his acts is far beyond the age where youth is incapable of committing a crime. p. 261.

17. HOMICIDE.—*Defendant not harmed by question whether deceased contributed to his parents' support, the question being withdrawn.*—In a prosecution for murder, the defendant was not harmed by a question propounded to a sister of the deceased asking whether the deceased contributed to the support of his father and mother, where such question was withdrawn upon objection. p. 261.

18. HOMICIDE.—*Testimony referring to deceased's funeral and death of his father not reversible error.*—In a prosecution for murder, the admission of testimony referring to the deceased's funeral and to the death of his father a few days later was not reversible error. p. 261.

19. HOMICIDE.—*Testimony as to vicious statements made by defendant while in jail not reversible error.*—In a prosecution for murder, the admission of testimony of a deputy sheriff as to vicious statements made by defendant while in jail awaiting trial was not reversible error. p. 261.

20. CRIMINAL LAW.—*Defendant's conduct and behavior while in jail awaiting trial may be shown.*—Evidence concerning the conduct and behavior of a defendant while in jail awaiting trial is proper. . p. 261.

From Marion Criminal Court (60,148); *James A. Collins,* Judge.

Wallace McCutcheon was convicted of murder, and he appeals. *Affirmed.*

*Fae W. Patrick, Clarence Wysong* and *E. Louis Moore,* for appellant.

*Arthur L. Gilliom,* Attorney-General and *Harry L. Gause,* Deputy Attorney-General, for the State.

MARTIN, J.—The appellant was indicted and tried by a jury which returned a verdict finding him guilty of murder in the first degree and fixing his punishment at death. The court pronounced a judgment delivering him to the warden of the state prison and directing that he there be put to death by electrocution. A motion for a new trial was overruled and the appellant appeals.

Counsel in the oral argument earnestly insisted that because of the youth of appellant, because the extreme penalty of the law has been imposed, and because 1. appellant was represented in the trial court by the county attorney for the poor, has appealed under the statute providing for appeals as a poor person, and is represented here by volunteer counsel, the court should carefully consider all the alleged errors now complained of, even though proper exceptions as to some of them were not taken below. The suggestion of counsel made in both argument and brief that appellant "did not receive proper representation" in the trial court, is not borne out by a careful examination of the record, and it appears that appellant's attorneys, both in the trial court and in this court, have performed their full duty. Appellant was found guilty on positive, uncontradicted evidence that fully supports the verdict, and the most that his attorneys can possibly hope for is to

secure a new trial wherein the jury might fix the punishment at life imprisonment rather than at death. As appellant points out, the inflicting of the death penalty is a solemn and momentous duty and great care should be taken "in reviewing capital convictions before we lend our sanction to the taking away of that which, when taken away, we cannot restore." *Noel* v. *State* (1920), 17 Okla. Crim. 308, 188 Pac. 688. For these reasons we have given the utmost care and consideration to all points raised or attempted to be raised by appellant, and now state the facts and such points fully, even at the risk of extending this opinion beyond a reasonable length.

There is no controversy over the evidence or the fact that the appellant shot and killed John Ward. The narration of the overt act appears from appellant's confession, from his testimony and from decedent's dying declaration. A portion of the written confession signed by the appellant and introduced in evidence by the state is as follows:

"As I got close to the Big Four Elevation on Prospect Street a man rode up on a bicycle and got off in back of me. He started to lead the wheel across the mud and I fell behind him. We were both walking towards the elevation and the man was six or seven feet in front of me. When we got under the overhead, which runs across Prospect Street, I pulled the revolver from my belt and told him to throw up his hands. He said nothing, dropped his wheel and threw his hands up. I told him to take his coat off and he did. I asked him to give me his money. He put his right hand in his pocket and pulled some money out of his pants pocket. He did not have enough money in his hand and I refused to take it. I had the Colt's Automatic pistol in my left hand and I had the trigger pulled back ready to fire. I was shaking and nervous and pulled the trigger while he had his hand up and facing the north wall of the over-

head support and I had the gun pointing at his back and was several feet from him.   When I fired the shot, I ran and went up the embankment on the south side of Prospect Street, up on the railroad, directly to my home.   I then undressed and went to bed.   Monday evening when I read the Indianapolis News and learned the man whose name was John Ward was the man I shot and killed."

The police officer who "made the run" to the scene of the murder about 10 p. m. January 17, 1926, testified that before Ward was sent to the City Hospital where he died, "we talked to Ward and asked him how he got shot."   That he said

"he was on his way to work at the Pennsylvania railroad and as he approached the elevation over Prospect street, he got off his bicycle to lead it across the mud.   He said he walked over towards the north wall and a young colored man came up with a 45 Automatic revolver and pointed it at him and told him to put up his hands.   He said he put up his hands and the colored man said 'take off that overcoat.'   He said he took off his overcoat and dropped it on the ground.   He said the young colored fellow walked from the front towards the rear and started around behind him and said, 'I am scared of you.'   He said he got behind him and said, 'Give me your money.'   Ward said, 'I told him, I have only got thirty cents, but you can have that,' and he said the next thing he knew he was shot.   Ward said he offered no resistance whatever and gave no reason at all for this man shooting him."

Another witness, a bystander who heard this dying declaration, testified to the same facts as the police officer.   The appellant, when placed upon the witness stand in his own defense, confirmed his confession and the police officer's report, by testifying that

"on Sunday night January 17, I walked east in Prospect street and as I approached the overhead elevation I saw a man with a bicycle who arrived

at the overhead at about the same time; I drew a gun and pointed it at the man. I demanded that he hold up his hands and hand me his money. The man did not do or say anything as he did not get a chance to for then the gun went off. I did not say to him that I was scared of him. I was not scared, I was nervous. Then I went home."

Other facts pertinent to this appeal as shown by the evidence are as follows: The appellant stole the pistol with which he killed Ward from the home of his companion and friend, John Andrew Smith. After committing the crime, he hid the pistol. When it was recovered by the police, appellant first said that Smith had given it to him, and accused Smith of shooting Ward. Upon Smith's denial and establishing an alibi, appellant said, two days later, "I lied to you, Horace Paragon was the fellow." Paragon was brought in and it was proved that this statement was also a lie. Finally, four days after that, when confronted with a letter which he had addressed to his mother and his uncle, appellant made the third confession, which was quoted from above. In the last confession, and in his testimony, appellant goes into detail about stealing the gun, says he gave it to his brother "to pawn for money to help my mother pay the rent"; tells of inquiring of his brother about 7 p. m. where the gun was; of a penny ante poker game he participated in with Horace Paragon and others from 7 to 8 o'clock in which he won about thirty cents, of going home, where he got the gun and $1.50 from his mother to get a prescription filled, of going to the drug store, where he found he had left the prescription at home, and that he bought five cents worth of candy, paying for it with a one dollar bill.

Appellant was sixteen years and four months old at the time this crime was committed. He testified that he lived with his mother; his brother who was twenty-

four years old and two sisters, one five years and one three months old; that he had not seen his father for nine or ten years and that his father and mother had been separated during all of that time; that he was in the eighth grade in school; that he had been convicted of larceny in city court five or six months prior to the murder trial, that he had been arrested "in a raid at Samuel Cameron's house" and that he had also appeared in the Juvenile Court in answer to some charge against him; that he weighed eighty-six pounds, and had never held any job, and could not get one; that he had never had a pistol before, and never had any experience with fire arms; that he did not intend to shoot Ward, and that the gun went off accidentally.

The statute under which appellant was indicted in two counts, provides that: "Whoever, purposely and with premeditated malice, or in the perpetration 2, 3. of, or attempt to perpetrate, a rape, arson, robbery or burglary, or by administering poison or causing the same to be administered, kills any human being, is guilty of murder in the first degree, and, on conviction, shall suffer death or be imprisoned in the state prison during life." Acts 1905 p. 534, §2412 Burns 1926. The first count of the indictment alleged that appellant "unlawfully, feloniously, purposely and with premeditated malice did kill and murder John Ward" and the second count alleged that he "unlawfully and feloniously did kill and murder said John Ward while engaged in an attempt to perpetrate the crime of robbery." Appellant contends that there is no evidence in the record on which a conviction on the first count of the indictment could be based, and that, although his counsel made no motion to withdraw the first count from the consideration of the jury, "it was the duty of the court to protect the defendant's rights by taking such action of its own motion." Each count of the indictment

alleged acts which constitute the same crime—murder in the first degree—and which are punishable by the same penalties, death or life imprisonment, and we do not believe that appellant's rights were infringed by failure to withdraw the first count. The allegations of the second count were proved clearly and without dispute, and, even if the first count had been insufficient, there would be no available error, as the general verdict will be conclusively presumed to be based upon the good count. *Stucker* v. *State* (1908), 171 Ind. 441, 84 N. E. 971. See, also, *McPherson* v. *State* (1912), 178 Ind. 583, 587, 99 N. E. 984, and *Cole* v. *State* (1922), 192 Ind. 29, 36, 134 N. E. 867, where failure to distinguish between crimes or different degrees of the same crime, where the punishment provided for each is the same, was held to be harmless.

Appellant doubtless makes the above contention on the assumption that intent to kill and malice, which are necessary elements to be proved under the first 4, 5. count, have not been shown. In the view we have taken, it is not necessary to decide this question, but it is a well-established rule of law that the intentional use of a deadly weapon in a manner as to cause death authorizes the presumption that the defendant acted maliciously, unless such use was in necessary self-defense, or upon a sudden heat, occasioned by adequate provocation, *Coolman* v. *State* (1904), 163 Ind. 503, 72 N. E. 568, and it is also well established that the purpose to kill may be inferred from the use of a deadly weapon in such a manner as will likely produce death, *Rigsby* v. *State* (1910), 174 Ind. 284, 91 N. E. 925; *Welty* v. *State* (1912), 180 Ind. 411, 100 N. E. 73.

Appellant next contends that instructions No. 2 and 3 should not have been given by the court. Instruction No. 2 merely defined, in the language of the 6-8. statutes, murder in the first degree, murder in the second degree and manslaughter. In de-

fining murder in the first degree, the penalty was stated, but the penalty was not stated for the other offenses. Stating or omitting to state penalties did not affect the definition of the several crimes, and appellant's objection that one penalty should not have been stated unless they were all stated was met by the final instruction given by the court on the determination of the degree of guilt, fixing the punishment therefor, and the form of the verdict, which set out the penalty for first and second degree murder, and explained to the jury that the penalty for manslaughter was fixed by law and was not determined by the jury.

Instruction No. 3 was in part as follows: "If you have a reasonable doubt of the guilt of the defendant as to the degrees of felonious homicide, you can only find him guilty of such degree as you have no reasonable doubt of his innocence." Appellant contends that the failure of the court to use the word "guilt" instead of "innocence" as the final word of this sentence constitutes reversible error. We do not think so. The sentence is awkwardly worded, but it cannot be held to have misled the jury because a subsequent instruction correctly instructed the jury as follows:

"No. 14. If under the law and evidence you shall find the defendant guilty, then you must determine the degree of guilt and fix the punishment therefor. If you find him guilty of murder and have a reasonable doubt as to whether he is guilty of murder in the first or second degree, then you should find him guilty of murder in the second degree. And if you find him guilty and have a reasonable doubt as to whether he is guilty of murder or manslaughter, then you should find him guilty of manslaughter. : . ."

The cases cited by appellant to the effect that an erroneous instruction cannot be corrected by the giving of a correct instruction, (*Weston* v. *State* [1906], 167 Ind.

324, 78 N. E. 1014; *Rahke* v. *State* [1907], 168 Ind. 615, 81 N. E. 584; *Fritz* v. *State* [1912], 178 Ind. 463, 99 N. E. 727, and *Dorak* v. *State* [1915], 183 Ind. 622, 109 N. E. 771), are authority only where it can be said that the giving of two inconsistent instructions leads to uncertainty in the minds of the jury as to the law.   Here the last instruction was not inconsistent with the first, but was a more clear and definite statement of the same thing.

The matter to which appellant objects in both instructions two and three has to do with second degree murder and manslaughter.   There was no evidence adduced which proved anything but first degree murder.   Appellant testified that he "did not intend" to kill John Ward but intent is not a necessary element of murder committed while perpetrating a robbery.   *Moynihan* v. *State* (1880), 70 Ind. 126, 36 Am. Rep. 178.

The motion for a new trial sets up that "new and material facts have been discovered since the trial, which could not, by reasonable diligence have been produced at the former trial," outlines these facts and supports them by affidavits.   It was the purpose of this motion to present facts to the lower court from which it would conclude that the appellant was insane and grant the motion so that the defense of insanity, which was not made at the trial, could be made upon a new trial of the case.   Testimony proffered as newly-discovered evidence to prove insanity would not be admissible under the issues as formed in the cause and existing at the trial, where no plea of insanity was interposed, and, in such case, it is not error to overrule a motion for a new trial on the ground of such newly-discovered evidence.   *Donahue* v. *State* (1905), 165 Ind. 148, 74 N. E. 996; *Hopkins* v. *State* (1913), 180 Ind. 293, 102 N. E. 85.   "It must be a very extreme case in

which the court is charged with the duty to grant a new trial in order that new issues may be formed." *Terlizzi* v. *State* (1926), 198 Ind. 491, 154 N. E. 276.

In the present case, however, for reasons set out at the beginning of this opinion, we shall not decide the matter on the points of law just stated, but will examine the facts presented by the motion and the affidavits in support thereof to see if they sustain appellant's contention that on a retrial of the cause he could prove insanity.

The evidence which appellant in his motion says he can produce follows: The affidavit of Dr. Henry W. Armstead, school physician, states that appellant's condition is "abnormal physically, the same being tubercular" and refers to "definite abnormalities which would naturally undermine his general understanding." The affidavit of Dr. Sumner A. Furniss, family physician, states that "he knows personally the mental as well as physical weakness of Wallace McCutcheon" and that he will testify to "mental weakness as well as physical abnormality." The affidavit of Shepherd Hardrick, neighbor, states that "Wallace McCutcheon was brought up under very unfavorable circumstances and always appeared to be mentally weak and underfed." The affidavit of Dr. Henry L. Hummons, states that appellant "is mentally deficient, and as such he is of the low moron type, and has chest signs of tuberculosis of an advanced stage." The affidavit of Miss Mary Sales, school nurse, states that appellant "is not only undernourished but that the record will disclose other definite signs of mental deficiency as well as tubercular development." The motion for a new trial also states that Mrs. Jeanette Cary, school principal, says appellant is, "in her opinion, lower than the moron type of the mentally deficient; that he is highly emotional and has no self control, yielding readily to the most simple suggestion from any source"; that Mrs. Mamie Whitaker, grocer, will testify

that appellant "and all the members of the McCutcheon family have displayed eccentricities when they came into her store"; and that members of appellant's family will testify "that one Mrs. Emma Smith (mother of his chum) did contribute in a definite way to his delinquency."

This proposed testimony that appellant is tubercular, is mentally weak and deficient and morally delinquent and is a moron who has no self control, is not testimony that appellant is an insane person with no sense of right and wrong, who, at the time of the commission of the crime, did not know and realize the consequences of his acts. The court, therefore, on the theory of newly-discovered evidence of insanity, would not have been justified in granting the motion for a new trial, regardless of the holding of the cases already cited.

13.

The record furthermore shows that the mental condition of appellant was given careful study before the trial and it was at that time determined that he was not insane and that a plea of insanity was not justified by the facts. This showing is made in an affidavit executed by the county attorney for the poor, who represented appellant below and who also appears of counsel here, which affidavit was filed in the trial court in support of appellant's motion for a new trial. This affidavit shows that the attorney had eighteen days notice of the trial date, that he conferred with appellant at the jail pertaining to his defense, questioned him as to his physical condition and "was informed by the said McCutcheon that his health was good, and questioned him as to any mental trouble that he may have had, and made great effort to find if there were any mental peculiarities existing in said McCutcheon and further that this affiant interviewed the mother and grandmother of said Wallace McCutcheon, and endeavored to ascertain if the said Wallace McCutcheon had any mental

deficiency, or if any history of insanity was apparent in the family of said McCutcheon; that after diligent questioning and search, this affiant was unable to find any facts that would lead him to believe that said mental deficiency existed as to said Wallace McCutcheon, that would justify this affiant as his attorney to file a special plea of insanity, and accordingly the cause was tried without any special plea and upon the general issues."

The affidavit concludes with a reference to the proposed testimony of the several affiants and proposed witnesses which has been reviewed above. ·

Appellant assigns as another reason why he should be granted a new trial "that the verdict of the jury inflicts cruel and excessive punishment." The provision of Art. 1, §16, Indiana Constitution, §68 Burns 1926, that "cruel and unusual punishment shall not be inflicted" is not violated by a death penalty for murder. See *Hobbs* v. *State* (1893), 133 Ind. 404, 409, 32 N. E. 1019, 18 L. R. A. 774; *Wilkerson* v. *Utah* (1878), 99 U. S. 130, 25 L. Ed. 345. "It is absurd to suppose that the constitution prohibits" punishment by death for murder, *State* v. *Tomassi* (1908), 75 N. J. Law 739, 747, 69 Atl. 214. The punishment fixed is legal and the Supreme Court could not interfere, if it so desired, on account of the severity of the penalty. *McCulley* v. *State* (1878), 62 Ind. 428; *Murphy* v. *State* (1884), 97 Ind. 579. Nor is the punishment of death for murder in the first degree in conflict with Art. 1, §18 of the Constitution, §70 Burns 1926—"the penal code shall be founded on principles of reformation, and not vindictive justice." Such punishment "is not vindictive but is even-handed justice," *Driskill* v. *State* (1855), 7 Ind. 338, 343, necessarily meted out for the maintenance of the peace and the protection of the citizens of the state.

It is a matter of deep regret that one so young as appellant should have to sustain the extreme penalty,

but sixteen is well beyond the age where youth is considered incapable of crime. 31 C. J. 1079; *Bottorff* v. *South Construction Co.* (1916), 184 Ind. 221, 227, 110 N. E. 977. Appellant's statement as to his hiding the revolver shows that he knew the difference between right and wrong and understood the nature of his act.

Finally, appellant contends that there was error in admitting certain testimony of the witnesses Ross, Worhay and Sands. The record shows that objection was made to a question propounded to the witness Mrs. Frank D. Ross, a sister of the deceased, asking whether deceased contributed to the support of his father and mother, and that the question was thereupon withdrawn. Appellant was not harmed by this. *Duncan* v. *State* (1908), 171 Ind. 444, 86 N. E. 641.

Mrs. Elizabeth Worhay, another sister, without objection by appellant, testified as to decedent's place of employment, that he worked from 11 p. m. until 7 a. m., as to his residence, that he lived with his aged father and mother, and that his father died five days after the shooting, and that she attended her brother's funeral. The witness Sands, a deputy sheriff at the county jail, without objection, testified that appellant told him it was true he had shot Ward, that he was not ashamed of his act, that he would shoot Sands if he got a chance, and that as the witness went to lock up appellant, appellant said, "I will get you, you big son-of-a-bitch when I get out." Mrs. Worhay's references to the father's death and to John Ward's funeral were irrelevant but certainly, in the absence of any objection thereto at the trial, we cannot hold that their admission constitutes reversible error. Likewise, objection to part of the deputy sheriff's testimony might have been sustained, if made, although it has been held that evidence concerning the conduct and behavior of a

defendant in a criminal action while in jail awaiting trial may be shown. *Siberry* v. *State* (1893), 133 Ind. 677, 33 N. E. 681; 16 C. J. 549, 553; 8 R. C. L. 186. Judgment affirmed.