LESTER FRENCH *v.* STATE OF INDIANA.

[No. 1175S321. Filed May 6, 1977. Rehearing denied December 29, 1977.]

*Jan E. Helbert, George A. Cottrell,* of Indianapolis, *John E. Eisele,* of Anderson, for appellant.

*Theodore L. Sendak,* Attorney General, *Walter F. Lockhart,* Deputy Attorney General, for appellee.

ARTERBURN, J.—The Appellant, Lester French, was indicted by the Madison County Grand Jury on July 31, 1974, for five counts: first degree murder while engaged in the commission of a kidnapping; kidnapping; commission of a felony (robbery) while armed; commission of a felony (rape) while armed; and carrying a handgun without a license. On August 12, 1974, the Appellant moved for a change of venue. This motion was granted and the cause was venued to Henry County. After trial by jury the Appellant was found guilty of all five counts on April 30, 1975. The Appellant was sentenced to death for his murder conviction, life imprisonment for his kidnapping conviction, fifteen years imprisonment for each of his armed felony convictions, and six months imprisonment for his conviction of carrying a handgun without a license. The terms of imprisonment were designated by the

trial judge to run consecutively. The Appellant's motion to correct errors was filed on July 3, 1975, and was denied on August 24, 1975.

Since the Appellant does not challenge the sufficiency of the evidence upon which his convictions were based, an extensive recitation of facts by this Court is not necessary. In brief, the evidence at trial revealed that at about 5:00 p.m., July 22, 1974, the Appellant robbed the family grocery store of Pauline Hart in Summitville, Indiana. During the course of the robbery, Mrs. Hart's granddaughter, Kathy Wylie, entered the store. When the Appellant took money and two cartons of cigarettes from the store, he also took Miss Wylie.

The Appellant and his captive emerged from the store and entered a waiting automobile driven by Charles L. Martin. Martin testified at trial that he and the Appellant both had sexual intercourse with Miss Wylie in the car during the course of their drive. "[T]oo scared to say anything," she was also sodomized by the Appellant. After some period of time, the Appellant indicated to Martin that they had to "get rid" of their victim. The car was stopped. Each man took his turn at bludgeoning the girl with a pipe wrench. When she still exhibited signs of life, she was rolled down a river enbankment. Her head was held beneath the water until her struggling stopped. Pathological examination of the decedent established asphyxia due to drowning as the cause of death.

## I.

The Appellant's first three arguments challenge the constitutionality of this state's death penalty. The statute under which the Appellant was tried and convicted reads as follows:

> "*Murder—First degree.*— (a) Whoever kills a human being either purposely and with premeditated malice or while perpetrating or attempting to perpetrate rape, arson, robbery, or burglary is guilty of murder in the first degree and, on conviction, shall be imprisoned in the state prison during life, unless the killing is one for which subsection (b) prescribes the death penalty.

(b) Whoever perpetrates any of the following acts is guilty of murder in the first degree and, on conviction, shall be put to death:

(1) Killing purposely and with premeditated malice a police officer, corrections employee, or fireman acting in the line of duty.

(2) Killing a human being by the unlawful and malicious detonation of an explosive.

(3) Killing a human being while perpetrating or attempting to perpetrate rape, arson, robbery, or burglary by a person who has had a prior unrelated conviction of rape, arson, robbery, or burglary.

(4) Killing a human being while perpetrating or attempting to perpetrate a kidnapping.

(5) Killing a human being while perpetrating or attempting to perpetrate any seizure or exercise of control, by force or violence or threat of force or violence and with wrongful intent, of an aircraft, train, bus, ship, or other commercial vehicle.

(6) Killing a human being purposely and with premeditated malice:

(i) by a person lying in wait;

(ii) by a person hired to kill;

(iii) by a person who has previously been convicted of murder; or

(iv) by a person who is serving a life sentence.

An indictment under subsection (b) may not charge a lesser included offense, but in all situations to which this subsection applies, the jury, or the trial judge if there be no jury, may find the defendant guilty of second degree murder or voluntary or involuntary manslaughter, if the facts proved are insufficient to convict the defendant of the offense charged." Ind. Code § 35-13-4-1 (Burns 1975).

The Appellant's first argument asserts that the death penalty is unconstitutional *per se* as cruel and unusual punishment, prohibited under the Eighth Amendment of the United States Constitution and Article 1, § 16 of the Constitution of the State of Indiana. The United States Supreme Court, in a series of recent cases concerning capital punishment, has rejected the argument that the death penalty under any circumstances is cruel and unusual. *Gregg* v. *Georgia,* (1976)

428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859; *Proffitt* v. *Florida,* (1976) 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913; *Jurek* v. *Texas,* (1976) 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929; *Woodson* v. *North Carolina,* (1976) 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944; *Roberts* v. *Louisiana,* (1976) 428 U.S. 325, 96 S.Ct. 3001, 49 L.Ed.2d 974. We agree with that conclusion. The Fifth Amendment of the Constitution of the United States recognizes that the death penalty may be inflicted in stating that no person shall "be deprived of life, liberty, or property, without due process of law."

The Appellant also relies upon Article 1, § 19 of the Constitution of the State of Indiana:

"The penal code shall be founded on the principles of reformation, and not of vindictive justice."

This provision has been consistently interpreted by this Court not to prohibit capital punishment for the crime of first degree murder. *Adams* v. *State,* (1971) 259 Ind. 64, 271 N.E.2d 425; *Hawkins* v. *State,* (1941) 219 Ind. 116, 37 N.E.2d 79; *McCutcheon* v. *State,* (1927) 199 Ind. 247, 155 N.E. 544; *Driskill* v. *State,* (1855) 7 Ind. 338.

The Appellant's second argument relies upon *Furman* v. *Georgia,* (1972) 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346. Since the series of more recent United States Supreme Court decisions mentioned above refines the *Furman* decision and is, we think, dispositive of the constitutionality question raised here, we will not address this second argument. Rather, we look to the Appellant's third argument, in which those cases are relied upon.

*Woodson* v. *North Carolina, supra,* concerned a North Carolina statute markedly similar to the Indiana statute under which the Appellant was convicted. The North Carolina statute reads:

*"Murder in the first and second degree defined; punishment.*—A murder which shall be perpetrated by means of poison, lying in wait, imprisonment, starving, torture, or by any other kind of willful, deliberate and premeditated killing, or which shall be committed in the perpetration or

attempt to perpetrate any arson, rape, robbery, kidnapping, burglary or other felony shall be deemed to be murder in the first degree and shall be punished with death. All other kinds of murder shall be deemed murder in the second degree, and shall be punished by imprisonment for a term of not less than two years nor more than life imprisonment in the State's prison." N. C. Gen. Stat. § 14-17 (Cum. Supp. 1975).

The plurality of the Supreme Court found this statute to be constitutionally deficient on three grounds:

1) It provided for a mandatory, automatic death penalty, which departed "markedly from contemporary standards respecting the imposition of the punishment of death and thus cannot be applied consistently with the Eighth and Fourteenth Amendments' requirement that the State's power to punish 'be exercised within the limits of civilized standards.'" (citation omitted) 428 U.S. at 301, 96 S.Ct. at 2990, 49 L.Ed.2d at 959.

2) It failed to provide the jury with "objective standards to guide, regularize, and make rationally reviewable the process for imposing a sentence of death," contrary to *Furman* v. *Georgia, supra.* 428 U.S. at 303, 96 S.Ct. at 2991, 49 L.Ed.2d at 960.

3) It failed "to allow the particularized consideration of relevant aspects of the character and record of each convicted defendant before the imposition upon him of a sentence of death," contrary to "the fundamental respect for humanity underlying the Eighth Amendment." 428 U.S. at 304, 96 S.Ct. at 2991, 49 L.Ed.2d at 960-961.

While there is always difficulty in applying the reasoning of a *plurality* of a court, when the concurring opinions are considered, there can be no doubt that the Indiana statute is unconstitutional under *Woodson* v. *North Carolina, supra,* and its companion cases. The sum and substance of the verbiage of the plurality opinions is that the death penalty may not be mandatory, nor may it be left to the unlimited discretion of the jury. In other words, there is is gray area

between mandatory sentences and discretionary sentences in which the death penalty may be imposed. This gray area, as pointed out by the dissenting opinions, is left undefined.

We point out that standards are either mandatory or discretionary. If standards were fixed in the gray area that limit discretion then the death penalty becomes mandatory insofar as the standards are definite and certain. If the standards are not definite and certain in this gray area then the discretion is unlimited insofar as it is indefinite. The United States Supreme Court thus leaves the legislature, faced with the problem of fixing standards, upon the horns of a dilemma. When are the standards for the imposition of the death penalty mandatory and when are they too broad and discretionary?

Although the writer of this opinion does not agree with the present reasoning of the United States Supreme Court plurality opinion upon the issue here involved, we have taken an oath to support the Constitution as interpreted by that Court. We have no alternative, in view of the present statute and its similarity to the one in North Carolina, but to hold that the Indiana statute is unconstitutional.

We reach this conclusion in the face of Article 7, § 4 of the Constitution of the State of Indiana which provides that this Court "shall have, in all appeals of criminal cases, the power to review all questions of law and to review and revise the sentence imposed." The State has suggested that this power to review and revise sentences acts as a valid restraint upon the arbitrary imposition of the death penalty. The State has also suggested that Ind. R. Tr. P. 59(A) (applicable to criminal cases through Ind. R. Crim. P. 21), which concerns trial court correction of errors and judgments, provides a procedure for trial court review and revision of death sentences.

These contentions suffer on two counts. First, we do not see how this Court or a trial court could review and revise sentences of death in the absence of statutory procedures

providing for the introduction of appropriate evidence upon which to base such review. Second, we do not see it as the role of the judiciary to legislate the standards by which the death penalty should be applied. The establishment of such standards, and the procedures by which evidence relevant to those standards and the individual accused would be made a part of court record, are tasks within the realm of the legislative branch.

The decision here by this Court does not reverse the Appellant's conviction for first degree murder. Only the penalty is affected, as Section 3 of Acts 1973, P.L. 328, provides for the separability of the provisions of Ind. Code § 35-13-4-1. That penalty must be vacated.

## II.

The next error alleged by the Appellant concerns motions for mistrial based upon responses elicited from prosecution witnesses regarding the Appellant's prior criminal record. The first such testimony came from Charles Martin. He was asked where he had first met the Appellant, and he answered "In the Indiana Reformatory." Witness Sam Whitman, a parole officer at the Indiana Reformatory, was permitted over defense objections to testify that he knew the Appellant in the reformatory and, based upon reformatory records, that the Appellant was there upon conviction for rape. Witness Gertrude Medley stated, in response to questions as to money the Appellant may have had on the morning of the crime, that she had given him $2.00 on Friday night to put gas in the car and go see his "probation man."

We find no error in the denial of the Appellant's motions for mistrial which stemmed from the testimony of these witnesses. When the defense objected to Gertrude Medley's testimony, the trial court immediately admonished the jury to disregard the witness's statement except for the fact that she had given the Appellant money to buy gas. An admonishment is presumed to cure error

in the admission of evidence unless the contrary is shown. *May* v. *State*, (1976) 265 Ind. 25, 349 N.E.2d 171.

The Appellant cannot complain regarding the testimony by Martin and Whitman that he had been incarcerated in the Indiana Reformatory, and that he had been there because of a rape conviction. Martin repeated during re-direct examination that the Appellant had been in jail. This testimony was not objected to by the defense, and any error stemming from that testimony was thereby waived. *Carroll* v. *State*, (1975) 263 Ind. 696, 338 N.E.2d 264. The Appellant took the stand himself and testified that he had met Martin while serving a sentence of two to twenty-one years for rape. Reversal may not be predicated upon the erroneous admission of evidence when evidence having the same probative effect is admitted without objection or contradiction. *Boles* v. *State*, (1973) 259 Ind. 661, 291 N.E.2d 357.

### III.

The trial of this case was held in Henry County, Indiana, upon change of venue from Madison County, Indiana, over defense objections that the Appellant's murder count should have been tried in Hamilton County. The indictment against the Appellant charged that the killing did take place in the latter county. It is urged here that the trial court erred in denying a defense motion to transfer trial of that count and it further erred in rejecting a tendered defense instruction concerning venue.

Article 1, § 13 of the Constitution of Indiana guarantees, among other things, that an accused in a criminal prosecution shall have the right to trial in the county in which the offense charged was committed. The evidence in this case showed that the robbery, abduction, sexual attacks, and murder charged were all integrally related. One act led to another in what, for purposes of venue, may be considered a single chain of events. "If the commission of a crime is commenced in one county and is consummated in another county, trial may be had in either of said counties."

Ind. Code § 35-1.1-2-1 (d) (Burns 1975). The basis for venue in Madison County was sufficient and the Appellant's trial in Henry County, upon change of venue was proper. *Cf. Conrad* v. *State,* (1974) 262 Ind. 446, 317 N.E.2d 789.

The venue instruction tendered by the defense and rejected by the trial court reads as follows:

"If you find from the evidence that the killing of the said Kathy Wylie occurred in the County of Hamilton, but that the killing was not a part of a common plan, design, and intent to kidnap and kill said Kathy Wylie which originated in Madison County, Indiana, and was not part of one continuous course of action by the defendant which originated and commenced in Madison County, Indiana, but that the intent to kill was arrived at and the fatal blow struck in Hamilton County, Indiana, and that such intent and action originated there and after the commission of the offense of kidnapping in Madison County, Indiana, and that the same was not part of one continuous plan, design and intent, and not the result of one continuous course of action by the defendant, but was a separate and independent set of acts occurring outside the county of Madison, then the County of Madison would have no jurisdiction to prosecute the defendant for the offense of Murder as charged in Count I of the indictment and you must find the defendant not guilty as to Count I of the indictment."

No evidence in this case indicated that the murder alleged was committed *after* the commission of the crime of kidnapping. As the evidence unfolded at trial, it became clear that the issue before the jury was not whether the murder alleged was committed in the course of a kidnapping, but whether the Appellant participated in that killing. "The instructions should be applicable to the issues supported by the evidence, and an instruction which is not based on and applicable to the issues supported by the evidence is generally erroneous, and may be properly refused." 8A I.L.E. *Criminal Law* § 552 at 221 (1971).

IV.

During cross-examination of the Appellant at trial, the prosecution attempted impeachment through the use of state-

ments made by the Appellant to his parole officer and another individual. Defense counsel objected on the ground that the statements had not been disclosed pursuant to a discovery order issued by the trial court. Defense counsel also moved for a mistrial. While the objection was sustained, the Appellant contends the trial court erred in overruling the motion for a mistrial.

The record reveals that the trial court went to great lengths to remedy any harm here. After hearing evidence on the prosecution's possession of these statements, the trial court granted a defense motion to strike the questions put to the Appellant. The trial court further ordered that the State could not use the two individuals whose statements were involved as witnesses. When the jury returned, it was admonished to disregard the objected to questions and answers.

We think this action by the trial court was sufficient. Sanctions for failure to comply with a discovery order are discretionary, not mandatory. Ind. R. Tr. P. 37; *Lund* v. *State,* (1976) 264 Ind. 428, 345 N.E.2d 826. The granting of a mistrial is also within the sound discretion of the trial court. *Lolla* v. *State,* (1973) 260 Ind. 221, 294 N.E.2d 798. We have already noted in this opinion that admonishment is presumed to cure error in the admission of evidence unless the contrary is shown. *May* v. *State, supra.* The contrary has not been shown here, and we can find no abuse of discretion in the trial court's denial of the Appellant's motion for a mistrial.

## V.

It is next contended that the trial court erred in giving Court's Instruction No. 34, which reads as follows:

"To prove a taking from the person of another in a charge of robbery, it is not necessary for the prosecution to show that the money or property was taken directly from the person robbed, but it is sufficient to show that it had been taken from the personal presence of such person. There-

fore, in this case, it is not necessary for the State to prove that the defendant took money or property from the physical person of Pauline V. Hart, but it is sufficient if the State proves, by the evidence, beyond a reasonable doubt, that the defendant took money or things of value from the personal presence of Pauline V. Hart, by violence, or by putting Pauline V. Hart in fear."

The basis of the Appellant's objection to this instruction is that it "places undue emphasis on the testimony of witness Pauline Hart." We cannot agree. The use of the witness's name here merely relates applicable law to the particular facts of this case. While the instruction could have been written, as the Appellant suggests, without reference to any particular witness, we do not see that this instruction prejudices the Appellant in any way.

## VI.

On July 27, 1974, the Appellant, while refusing to sign a written statement, gave an oral statement to police in which he admitted the armed robbery and kidnapping charges against him, but denied participation in any sexual acts or murder. This oral statement was admitted into evidence at trial over defense objections that it was made involuntarily and without proper advisements of constitutional rights. The admissibility of this statement is again raised here.

The trial court properly held two hearings outside the presence of the jury when the admissibility of this statement was challenged. The first centered on the Appellant's rights under *Miranda* v. *Arizona*, (1966) 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, the second on the general question of voluntariness. (We do not wish to imply that two separate hearings are required in such a situation. Both questions are related and could have been resolved after a single evidentiary hearing.)

The Appellant testified, in short, that following his arrest on July 23, 1974, he was taken to the "Boards", a part of the Madison County Jail he describes as "dungeon-like." He

stated that between the time of his arrest and his confession on July 27, he was threatened by police, called names, and not advised of his *Miranda* rights. He signed no waiver of rights form. He testified that he had only an eighth grade education.

Police officers testified that the Appellant was driven to the Madison County Jail from Boone County, where he was arrested. They testified that he was advised of his *Miranda* rights in the Boone County Jail and was not threatened or called names during the late-night drive to Madison County. Police also denied that any threats or name-calling were directed at the Appellant at the Madison County Jail. The Appellant himself admitted that he had been advised of his rights by a judge during a post-arrest hearing on the morning of July 24, at which time an attorney was appointed to represent him. Police testified further that before making his statement the Appellant was advised of his rights and "two or three" times told he could see his attorney before making any statement.

The session with the Appellant which led to his statement was described by one police officer:

> "I read his rights to him from the form. He did say that he wasn't going to sign anything. I did go ahead and tell him, well, I'm required to read 'em to you anyhow, even though I know you know 'em, no doubt, or words to this effect. He did refuse to sign any warning of his rights, at which time I told him that he didn't have to talk to me and asked him if he'd been in contact with his attorney, at which time he stated he understood he had an attorney appointed but that he had not been in contact with him. I stated to Lester French 'You don't have to talk to us now, wait until you talk to your attorney and then we'll talk to you and your attorney or anyway you want to do it.' He stated at this time 'I won't give a written statement, I won't sign a statement but I know I'm gettin' the blame for some things I didn't do and I'd like to tell you about them' and I said 'We'll listen to anything you've got to say', at which time he went on to relate the facts I already mentioned a moment ago. * * *"

The trial court concluded that the Appellant's statement was volunteered, not the product of police interrogation, and therefore admissible under *Miranda*. The evidence supports this finding. *Riddle* v. *State,* (1976) 264 Ind. 587, 348 N.E.2d 635. The trial court further found that the statement was voluntarily given. This Court will not ordinarily disturb such a finding of fact when that determination is based upon conflicting evidence. *Cowell* v. *State,* (1975) 263 Ind. 344, 331 N.E.2d 21. Sufficient evidence supports the finding here and we can find no abuse of trial court discretion.

In a related contention, it is asserted that the trial court abused its discretion when it denied a defense motion to view the "Boards" of the Madison County Jail. Given the scope of the evidence submitted at the voluntariness hearings, we do not find such an abuse of discretion.

## VII.

The final contention in this appeal is that the trial court erred in excluding from evidence Defendant's Tendered Exhibits B, C, D and E, copies of psychiatric reports filed in a companion case concerning witness Charles R. Martin. Martin, charged in a separate indictment with the same offenses as the Appellant, had pleaded not guilty by reason of insanity. Martin's attorney took the stand in an attempt to bolster the witness's credibility and testified that, in his opinion, Martin was sane. The Appellant then sought to attack the basis for this opinion through the use of the psychiatric reports in question.

The trial court properly excluded these exhibits as hearsay evidence. *See* McCormick, Evidence § 248 (2d Ed 1972). The psychiatrists who conducted the examinations of Martin could have been called to testify as to their conclusions. Admission of the reports they submitted, however, without their being present in court, would deny the State its right of cross-examination. It is this right that lies at the heart of the hear-

say rule. *Patterson* v. *State*, (1975) 263 Ind. 55, 324 N.E.2d 482.

This case is remanded to the trial court with instructions to vacate the Appellant's death sentence and impose in its stead one of life imprisonment. The judgment of the trial court is otherwise affirmed.

Givan, C.J., Hunter, J., concur; Prentice, J., concurs in result; DeBruler, J., concurs and dissents with opinion.

CONCURRING AND DISSENTING OPINION

DEBRULER, J.—I concur fully in the holding of the majority that the death penalty imposed by our first degree murder statute, Ind. Code § 35-13-4-1(b) (Burns 1975) violates the Eighth Amendment prohibition against cruel and unusual punishment under the standards enunciated in *Woodson* v. *North Carolina*, (1976) 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944. I cannot concur in that part of the opinion suggesting that the holdings in *Woodson* and its companion cases on the one hand and *Furman* v. *Georgia*, (1972) 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346, on the other, have placed legislatures in a dilemma, in that *Woodson* condemns mandatory death penalties while *Furman* condemned jury discretion in the imposition of the death penalty. What *Furman* condemned was discretion to choose between capital and noncapital punishment which was not limited or directed by any standards, guidelines, or review. Such unbridled discretion was held to result in the imposition of the death penalty in an arbitrary manner, without regard to the interests sought to be protected, and with disproportionately heavy incidence upon members of unpopular minorities. Our Legislature interpreted *Furman* as suggesting that all jury discretion to choose between death and life imprisonment was suspect; the statute enacted sought to comply with Furman by eliminating all jury discretion. *Woodson* has simply proved this interpretation wrong. Discretion itself is not impermissible, but indeed is necessary. The discretion must be exercised under objective standards which prevent arbitrary application of the death

penalty and allow meaningful review of the sentence selection process. The Legislature is not held to an impossible burden in being required to establish such standards, as is illustrated by the Supreme Court's approval of the Florida, Georgia, and Texas statutes.

I likewise disagree with the majority's argument that the Fifth Amendment's due process clause recognizes the legitimacy of capital punishment as it is logically fallacious.[1]

I likewise cannot concur in the majority's disposition of the issue of the admissibility of appellant's oral statement to Sergeant Hart admitting appellant's guilt of armed robbery and kidnapping. I recognize that in reviewing the trial court's ruling on this issue we accept the lower court's findings if those findings are supported by sufficient evidence, and that we will not reweigh the evidence. However, it is undisputed that on the night of appellant's arrest he was presented with a *Miranda* rights advice and waiver form by Lieutenant Gates and Detective McCallister of the state police, and that appellant not only refused to sign the waiver form, but requested an attorney. Four days later Sergeant Hart and Detective McCallister brought appellant from his cell and Hart again advised appellant of his *Miranda* rights and asked whether appellant wished to talk about his charges. Appellant thereupon stated that he was guilty of armed robbery and kidnapping, without prompting by the troopers; indeed, it ap-

---

1. This argument commits the classical fallacy known as "denying the antecedent of a conditional statement." This fallacy is committed when a statement in the conditional form "if P then Q" is taken to imply "If not P, then not Q." The relevant language of the due process clause is "no person shall be . . . deprived of life . . . without due process of law. . . ." This language may be represented in conditional form as follows: If a person is denied due process (if P) then that person shall not be deprived of life (then Q). The majority seeks to infer from this statement that if a person is not denied due process (not P) then he may be deprived of life (then not Q). This violates the rules of deduction, as may be seen in this example:

"If Columbia University is in California, then it is in the United States.

Columbia University is not in California.

Therefore, Columbia University is not in the United States." W. Salmon, *Logic* 28 (2d ed. 1973).

pears that they might not have been able to stop him. From this evidence the trial court could not properly have found that appellant volunteered his admission so as to remove it from the applicability of *Miranda* v. *Arizona,* (1966) 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694.

As the Supreme Court held in *Miranda:*

> "Once warnings have been given, the subsequent procedure is clear. *If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease.*
>
> * * *
>
> *If the individual states that he wants an attorney, the interrogation must cease until an attorney is present.* At that time, the individual must have an opportunity to confer with the attorney and to have him present during any subsequent questioning. If the individual cannot obtain an attorney and he indicates that he wants one before speaking to police, they must respect his decision to remain silent." (Emphasis added.) 384 U.S. at 473-74, 86 S.Ct. at 1627-28.

This Court, in *Pirtle* v. *State,* (1975) 263 Ind. 16, 323 N.E. 2d 634, relied upon the above language to hold that a statement obtained from a suspect in custody, after that suspect had requested consultation with an attorney, was inadmissible. We reaffirmed *Pirtle* in *Stevens* v. *State,* (1976) 265 Ind. 396, 354 N.E.2d 727, and *Williams* v. *State,* (1976) 264 Ind. 664, 348 N.E.2d 623.

In *Brown* v. *State,* (1971) 256 Ind. 558, 270 N.E.2d 751, we held that a waiver was not demonstrated by evidence that the accused twice refused to sign waiver forms, but eventually confessed in response to continued interrogation. We quoted *U.S.* v. *Nielsen,* (7th Cir. 1967) 392 F.2d 849:

> "Here the defendant's refusal to sign the waiver form, followed by an apparent willingness to allow further questioning, should have alerted the agents that he was assuming seemingly contradictory positions with respect to his submission to interrogation. Instead of accepting the defendant's equivocal invitation, the agents should have inquired further of him before continuing the questioning to determine whether his apparent change of position was

the product of intelligence and understanding or of ignorance and confusion. However, no further inquiry took place. In the absence of such an inquiry, we are compelled to conclude that the defendant's negative responses to the questions asked him were not made after a knowing and intelligent waiver of his rights." 392 F.2d at 853.

In this case appellant requested an attorney on the night of his arrest, and the officers were required not to interrogate him thereafter until he had spoken with counsel. Nonetheless they took him to a private room, gave him *Miranda* warnings, and asked whether he wanted to talk. These actions can only be interpreted as an attempt to elicit a statement from appellant, occurring when no such attempt should have been made. Appellant's resulting admission cannot, therefore, be considered to have been "volunteered"; it was, rather, the result of custodial interrogation initiated by the police and conducted in violation of *Miranda* and *Pirtle*.

This is not a case such as *Michigan* v. *Mosley*, (1975) 423 U.S. 96, 96 S.Ct. 321, 46 L.Ed.2d 313, wherein the Supreme Court held that a confession given during interrogation occurring after Mosley declined to answer questions was not taken in violation of *Miranda*. Mosley was questioned by separate officers investigating separate crimes, and at no time expressed any desire to speak with an attorney. The Court distinguished *Mosley* from situations in which the suspect requests legal assistance. 423 U.S. at 104, n. 10, 96 S.Ct. at 366, n. 10. I would hold that the admission of appellant's oral statement was error.

I also find myself unable to agree with the majority's holding that the psychiatric reports tendered into evidence by appellant were properly excluded as hearsay. The State called as a witness Mr. Woolbert, attorney for Charles Martin, appellant's accomplice who testified for the State. The prosecutor was allowed to elicit from Mr. Woolbert that although he had filed a special plea of not guilty by reason of insanity in Martin's own pending case involving these charges, he did not believe that Martin was insane. He justiified this assertion thus:

[Mr. Woolbert] "First, the man's statement that he is sane, he's maintained that. My personal opinion is he's sane *and four psychiatrists say he's sane.*" (Emphasis added.)

On cross-examination of Mr. Woolbert the defense had him identify its Exhibits B, C, D, and E as photocopies of letters from four psychiatrists appointed by the Madison Circuit Court to examine Martin, reporting to that court as to Martin's mental condition. Woolbert was asked:

"Q. These are the reports . . . to which you testified on direct examination?

A. They are. They're photocopies."

The defense then offered the exhibits, and the trial court, after hearing argument and reviewing Mr. Woolbert's testimony, determined that the reports were inadmissible as hearsay, because the State could not cross-examine their authors as to their contents. The majority justifies the action on the same grounds.

I believe that both the trial court and the majority, in focusing upon the hearsay nature of the reports, misdirected their analysis. The witness Woolbert on direct examination supported his conclusion that his client was sane by relying on the opinions of "four psychiatrists." On cross-examination, he admitted that these opinions were contained in Exhibits B through E. Mr. Woolbert's statement, "four psychiatrists say so" was itself a paradigm of hearsay; should not appellant, having permitted its unchallenged reception, be allowed to rebut Woolbert by showing that the psychiatrists' reports upon which he relied did not actually or fully support his conclusion? I believe that the overwhelming weight of authority holds that he should be. In *Perkins* v. *Hayward*, (1890) 124 Ind. 445, 449, 24 N.E. 1033, this Court said:

"If a party opens the door for the admission of incompetent evidence he is in no plight to complain that his adversary followed through the door thus opened." (Citations omitted.)[2]

---

2. Or, as the West Virginia Supreme Court has said, "strange cattle having wandered through a gap made by himself, he cannot complain." *Sisler* v. *Shaffer*, (1897) 43 W. Va. 769, 28 S.E. 721.

See also *Apple* v. *Board of Commissioners*, (1891) 127 Ind. 553, 27 N.E. 166; *Glover* v. *Stevenson*, (1891) 126 Ind. 532, 26 N.E. 486; *Shelby National Bank* v. *Miller*, (1970) 147 Ind. App. 203, 259 N.E.2d 450; *Reserve Life Insurance Co.* v. *Luedke*, (1961) 132 Ind. App. 476, 177 N.E.2d 482; 1 WIGMORE, EVIDENCE, § 15 at 304-308 (3d ed. 1940);[3] McCORMICK, EVIDENCE § 58 at 132 (2d ed. 1972); 4 JONES, EVIDENCE § 25:21 at 167 (6th ed. 1972); 12 I.L.E. *Evidence* § 54 at 486 (1959).

In this case Mr. Woolbert, not an expert in psychology or psychiatry himself, was allowed to armor his layman's assessment of Martin's sanity with the opinions of four unnamed psychiatrists, revealed on cross-examination to be the psychiatrists appointed to examine Martin in the latter's own prosecution. It is difficult to see how the defense could impeach Woolbert without examining him concerning the reports upon which he based his opinion. It is equally difficult to comprehend why the State, whose witness injected the opinions of the psychiatrists into the case, should be allowed to complain of its inability to cross-examine those psychiatrists.

I would therefore reverse this conviction and order a new trial.

NOTE.—Reported at 362 N.E.2d 834.

---

3. Wigmore actually discerns three competing rules among American and English jurisdictions. One requires an objection by the party to the "opening of the door," but this requirement is relaxed where, as here, the question eliciting the hearsay conveys no warning of the hearsay answer. Id. at 305, n. 1. One of the other rules allows the curative admission of otherwise inadmissable evidence in all cases ("English rule"), the other where prejudice results from the first wrongful admission. ("Massachusetts rule"). Indiana has cases listed under each of the latter two rules. Id. at 306, n. 2, 308, n. 3.