Steven T. JUDY, Appellant,

v.

STATE of Indiana, Appellee.

No. 580S128.

Supreme Court of Indiana.

Jan. 30, 1981.

Kenneth M. Stroud, Indianapolis, Stephen L. Harris, Mooresville, for appellant.

Linley E. Pearson, Atty. Gen., Michael Gene Worden, Asst. Atty. Gen., Charles D. Rodgers, Deputy Atty. Gen., Indianapolis, for appellee.

PIVARNIK, Justice.

This cause is before us for review by virtue of appellant Steven T. Judy's "Verified Petition for Determination of the Status of This Appeal," filed by his court-appointed counsel. This petition shows that, on February 25, 1980, appellant Judy was sentenced to death upon conviction of four counts of murder. These charges arose out of the April 28, 1979 slayings of Terry Chasteen and her three children, Misty Zollers, Stephen Chasteen and Mark Chasteen. The trial judge signed the death warrant and ordered the sentence to be carried out. On the day he was sentenced, appellant Judy requested that an appeal be filed, and Kenneth M. Stroud and Stephen L. Harris were appointed appellate counsel. Judy's attorneys timely filed a motion to correct error on April 16, and the trial court denied the motion on May 6. On May 23, Judy's attorneys filed a praecipe for the record with the Clerk of the Morgan Superior Court, and, on August 4, counsel filed the record of the proceedings with the Clerk of the Supreme Court. This Court then granted a petition for extension of time to file appellant's brief. At the time of the filing of the "Verified Petition for Determination of the Status of This Appeal" on October 14, the due date for appellant's brief was October 20.

On October 8, Judy notified his counsel and this Court that he desired to terminate the appeal prior to the completion and filing of his brief; he requested that counsel cease all efforts toward proceeding with his appeal. Judy further indicated to counsel that he wished to waive his right to appeal and to completely terminate the appeal proceedings.

Counsel asserted in their verified petition that conflicting duties, created by the Code of Professional Responsibility adopted by this Court and the nature of the sentence imposed here, placed them in an "intolerable dilemma." One portion of the death penalty statute, Ind.Code § 35–50–2–9(h) (Burns 1979 Repl.), provides:

"(h) A death sentence is subject to automatic review by the Supreme Court. The review, which shall be heard under rules adopted by the Supreme Court, shall be given priority over all other cases. The death sentence may not be executed until the Supreme Court has completed its review."

Under this section, then, a sentence of death may not be carried out in this State until there has been a review by this Court. Generally, this provision would have imposed a duty on Stroud and Harris, as Judy's appointed counsel, to complete this appeal and thereby assist in this Court's review. Therefore, they would have violated that duty if they had followed the directives of their client and ceased to prosecute this appeal.

On the other hand, attorneys generally have a duty to act on their clients' requests, and counsel here recognized that they should comply with Judy's request, if that request was knowingly, voluntarily and intelligently made. Thus, as counsel asserted in their verified petition:

"Appellant's counsel cannot determine which duty to follow. If the Statute is construed as mentioned and counsel drop the appeal pursuant to Appellant's request they have violated the statutory duty. If the Statute is construed as allowing waiver of appeal in death cases and counsel ignore Appellant's request and file the appeal they have violated their duty to their client."

Therefore, to fully protect their interests and those of their client, counsel requested that this Court dispose of this "insoluble professional and ethical problem."

After considering the issues presented in counsel's petition, this Court concluded that § 35–50–2–9(h) precludes waiver of a review of the *sentencing* in a death penalty case. However, we further found that this statute does not preclude waiver of a review of a murder *conviction*. Accordingly, this Court set a hearing for October 27, for Judy to appear personally before us so that we might determine whether he did, in fact, wish to waive his appeal of this conviction, and, if he did so waive, whether that waiver was voluntarily and knowingly made. In this opinion, we shall: (1) determine the validity of Judy's waiver of appellate review of his convictions; and (2) review the death sentence imposed by the trial court.

I.

■ It is well established that an individual in the setting of a criminal prosecution may waive his constitutional rights. Generally, this waiver must be knowingly, voluntarily and intelligently made. *E. g., Brewer v. Williams* (1976) 430 U.S. 387, 97 S.Ct. 1232, 51 L.Ed.2d 424; *Gilmore v. Utah* (1976) 429 U.S. 1012, 97 S.Ct. 436, 50 L.Ed.2d 632; *Faretta v. California* (1975) 422 U.S. 806, 95 S.Ct. 2525, 45 L.Ed.2d 562; *Boykin v. Alabama* (1969) 395 U.S. 238, 89 S.Ct. 1709, 23 L.Ed.2d 274; *Johnson v. Zerbst* (1938) 304 U.S. 458, 58 S.Ct. 1019, 82 L.Ed. 1461. *See Baker v. State* (1980) Ind., 400 N.E.2d 137; *Holleman v. State* (1980) Ind., 400 N.E.2d 123; *Tyson v. State* (1979) Ind., 386 N.E.2d 1185; *State v. Brown* (1941) 219 Ind. 251, 37 N.E.2d 73. *Gilmore v. Utah, supra,* presented substantially the same situation we face here. The defendant there, Gary Gilmore, was convicted of murder and sentenced to death by a Utah trial court. He ordered his counsel to stop all appeals and to allow the death sentence to stand unchallenged. The Utah Supreme Court held a hearing and personally interviewed Gilmore to determine that he was knowingly, intelligently and willingly waiving his right to any further appeal. That Court accepted Gilmore's waiver.

Gilmore's mother, claiming to act as next friend on behalf of her son, then filed an application for a stay of execution of the death sentence with the United States Supreme Court. The Supreme Court granted a temporary stay of execution in order to secure a response from the State of Utah. Gilmore, by and through his attorneys, challenged the standing of his mother to initiate any proceedings on his behalf.

■ After reviewing the transcripts submitted by the State of Utah, the United States Supreme Court found that Gilmore

had made a knowing and intelligent waiver of any rights he might have asserted after the trial court's sentence was imposed. The Court further specifically held that the Utah Supreme Court's determination of Gilmore's competence, and of his knowing and intelligent waiver of his rights, were firmly grounded. The United States Supreme Court also found that Gilmore's mother had no standing to initiate any proceedings on her son's behalf; therefore, the Court terminated the previously entered stay of execution. Our inquiry here, then, is to determine whether Steven Judy is intelligently, knowingly and voluntarily waiving his right to appeal his four convictions for murder.

Judy's response to the legal procedures in this case was much like Gilmore's in Utah; in fact, one might surmise that Judy was aware of Gilmore's activity, as it was heavily publicized, and opted to bring to bear the same results in this case. An examination of the transcripts and record of the trial before the court and jury reveals that the prosecution presented overwhelming evidence of Judy's guilt.

Steven Judy was convicted of murdering Terry Chasteen and her three children: Misty Zollers, age five years; Stephen Chasteen, age four years; and Mark Chasteen, age two years. Hunters discovered Terry Chasteen's body at approximately 9:30 a. m. in White Lick Creek, near State Road 67 and Mooresville in Morgan County. A police search of the creek led to the discovery of the other three bodies. Terry Chasteen was found naked, with her hands and feet bound with strips of material torn from her clothing, and her head covered with her slacks. She had been gagged and strangled with other strips of cloth. The evidence established that Terry Chasteen had been raped and that she died of strangulation, while the children died of asphyxia due to drowning.

Certain physical evidence tended to circumstantially connect Steven Judy with this incident. Tests on a coat found at the scene of the crimes revealed a semen stain. Analysis of this stain indicated that the makeup of the substance was compatible with Judy's blood type and the finding of an "H endogen" in a sample of Judy's blood. Testimony established that, once the geographic location of the discovery of the substance was known, only a very small percentage of the male population was capable of producing semen with the identification qualities mentioned. In addition, two threads of material found in Steven Judy's truck substantially matched the threads of one article of Terry Chasteen's clothing.

The evidence further established that Terry Chasteen had left in her automobile with the three children some time after 6:00 a. m. She had planned to leave the children at a babysitter's house and continue on to her place of employment. When her probable driving route was retraced, her automobile was found parked near the interchange of Interstates 465 and 70 in southwest Marion County.

Several witnesses related that they had seen various segments of the incident. On the day of the killings and the preceding day, Steven Judy had in his control a red and gray truck which several witnesses placed at or near the location of Terry Chasteen's car on Interstate 465. One of the witnesses testified that he saw a blond-haired man, whom he later identified as Judy, standing near a car parked on the interstate with the hood open. Another witness testified that he was driving southwest on State Road 67 and saw a red and gray truck carrying a man, a woman, and some childreN, proceeding in the same direction. This witness stated that the truck was moving at a fast pace, and in a sometimes erratic manner, and that the woman in the truck waved to him when the two vehicles stopped at a traffic light.

Judy's truck was also seen parked near the scene of the killings by White Lick Creek around 7:00 to 7:30 a. m. One witness recognized the truck from having seen it on several occasions at a construction site. Another witness testified that he saw a man near the scene carrying a child under one arm and carrying a bundle, which actually had the shape and size of a child, under

his other arm. A third child was walking in front of the man. The witness saw no other person at that time. At approximately 7:30 a. m., a man was seen running away from the creek toward the parked truck. Near that same time, another person saw a man with blond hair backing his truck onto the travelled portion of the highway from this same location. The person who witnessed this occurrence testified that the driver of the truck was alone.

As noted earlier, Judy had possession of the truck in question on the day preceding and the day of the murders. The evidence established that Judy returned the truck to witness Robert Carr in Indianapolis between 8:00 and 9:00 a. m. on the day of the killings. Judy initially denied any involvement in the incident, and asserted that he was with his girlfriend at the time in question and could not remember what had happened. Judy's girlfriend first corroborated this story, but subsequently contradicted Judy's alibi.

At trial, Judy presented an insanity defense and testified at length concerning his commission of the rape and murders. Judy stated that he was driving on Interstate 465 in Marion County when he passed Terry Chasteen's car. He testified that he motioned for her to pull over to the shoulder of the road, indicating that something was wrong with the rear of her car. The two vehicles pulled to the shoulder and stopped, and Judy purported to assist the victims. In the process, he removed the coil wire, thereby rendering Terry Chasteen's car inoperable. When her car would not start, Judy offered her and the children a ride, and she accepted.

Judy then drove the victims to the location of the killings and pulled his truck off the road. He testified that he directed them on foot toward the creek, and that he sent the children down the path ahead of Terry and him. Judy testified that he then raped Terry Chasteen and bound her hands and feet and gagged her. When Terry cried out, the children ran back up the path to them. Judy stated that the children stood around him and yelled. At that point,

he strangled Terry Chasteen and threw her body into the creek. Judy testified that he then threw each of the children as far as he could into the water. He stated that he remembered seeing one of the children standing in the creek. Judy returned to his truck after attempting to eradicate his footprints. He then drove away from the scene, stopped and bought a soft drink, and threw the coil wire away. Thereupon, he returned the truck to Robert Carr at Carr's residence. Although Judy's version of the events presented some discrepancies concerning minor details, his testimony very substantially corroborated the evidence presented by the State.

The only defense presented at the trial was a plea of insanity at the time of the commission of the offenses. Dr. Cathy Spath Widom, a psychologist, testified for the defense that she believed Judy had chronic emotional problems. She described Judy as having an antisocial personality disorder, and was of the opinion that he was legally insane. She referred in her testimony to extensive records on Judy's life and mental condition; these records covered a period of fourteen years. During this time he had been examined and evaluated many times as a result of committing offenses at school and in his neighborhood. The evidence established that, when Judy was thirteen years old, he perpetrated a rape, stabbed the victim eighteen times, and hit her with a hatchet. As a result of this incident, he was admitted to Central State Hospital in Indianapolis for evaluation. While he was involved in Central State's treatment program, he became the foster child of a family in Indianapolis. He was discharged from Central State Hospital in 1972 at age sixteen, with a recommendation that he be returned to the juvenile center for placement at the Indiana Boys School. The hospital's evaluation stated that Judy had appeared to recover from his emotional problems and that further hospitalization was not warranted.

Judy testified that he had been committing various offenses since he was ten years old. He asserted that he had been involved

in approximately two hundred shoplifting incidents, a like number of burglaries, twenty to fifty robberies, approximately twenty-four car thefts, and from twelve to sixteen rapes. He also estimated that he had been examined by approximately thirty psychiatrists during those years. From 1975 to the time of these offenses, Judy had been out of jail for a total time of approximately four months. During those periods, he testified, he had lived with or had intercourse with fifteen women. Three women with whom Judy had lived testified that he had never threatened or physically harmed them. In fact, Judy was living with one of those women during the week prior to the commission of these murders.

However, other women testified as to various attacks Judy had committed upon them. These incidents involved accosting the victims in their cars and kidnapping, threatening and beating them. One witness testified to being a victim of one of Judy's armed robberies. These witnesses all believed Judy was in control of himself during the incidents and could have stopped doing what he was doing. However, one witness stated at one point that Judy "acted crazy" when he was beating her about the face. Previously conducted psychiatric evaluations classified Judy as having a personality disorder and concluded there was no indication of a mental illness. Two court-appointed psychiatrists, Dr. John Kooiker and Dr. Larry Davis, testified that they had examined Judy and that, in their opinions, he had an antisocial personality disorder. Both concluded that he was legally sane at the time of the commission of these crimes. In fact, the record reveals that every psychiatrist who has ever examined Judy has been of the opinion that he is of normal or above-average intelligence and that he is legally sane. The jury rejected Judy's insanity defense and convicted him on all charges.

After the jury found Judy guilty on all four counts of murder, and the bifurcated sentencing portion of the trial was commenced, Judy ordered his attorneys *not* to present any evidence of mitigating circumstances to the jury in regard to the sentence they might select and recommend. *See* Ind. Code § 35–50–2–9(c), (d) (Burns 1979 Repl.). Judy stated to the jury in open court at the sentencing hearing that he would advise them to give him the death sentence, because he had no doubt that he would kill again if he had an opportunity, and some of the people he might kill in the future might be members of the jury. He also directed a similar comment to the trial judge. Then, during final argument in the sentencing hearing, Judy ordered his attorneys *not* to argue *against* the death penalty. They complied with his request, except for a suggestion to the trial judge that the constitutionality of the death penalty statute ought to be considered before such a penalty is imposed.

On October 27, Judy appeared in this Court with his attorneys for a hearing on his request that he be permitted to waive his appeal. At that hearing, Judy very freely and openly discussed his situation with the members of this Court. It was obvious to all members of this Court that Judy well understood his situation and the results that could be expected from an acceptance of his waiver. Judy stated that he understood that he had a right to an appeal, that a review of the convictions might result in an order for a new trial, that in that event he would again be entitled to a jury trial, and that, at that new trial, he also would be entitled to a change of judge and a change of venue from the county. He further expressed an understanding that, if he were granted a new trial, he would be entitled to the assistance of counsel and to subpoena witnesses in his behalf. He also understood that he might be found not guilty at a new trial. In addition, Judy stated he was aware that our review of the sentence might result in the setting aside of the death sentence and the imposition of a term of years. Moreover, Judy acknowledged that he understood that a waiver at that time of review of his convictions would be considered his final decision, and would stand, even if this Court were to decide to set aside the death sentence. Finally, he freely admitted that he is guilty of the

murders of which he was convicted. Waiver Hearing Transcript at 8–19.

Thus, in response to questions from various members of the Court, he indicated that he was fully aware of all that might happen if this Court allowed him to waive his appeal. He discussed all of the alternatives with the Court and showed that he clearly and intelligently understood them. He responded to one question in the following manner: "I no longer wish any more representation by counsel, any counsel. All right? You know, I feel that it's my right that I can proceed with the appeal." Waiver Hearing Transcript at 15.

Judy further stated that he felt the attorneys in court with him, Stroud and Harris, were "darned good attorneys." He said he has no complaint about them, and, in fact, they are the best lawyers he has ever seen. Waiver Hearing Transcript at 12. Judy also wanted it to be known that his actions did not detract in any way from his feeling that they were representing him competently and were treating him fairly in all respects. He made it clear to this Court, as he had done at the sentencing hearing, that he did not want counsel to make arguments for him regarding the death sentence.

In addition, Judy asserted that he personally did not intend to take any further action on his appeal. In answer to another question from the Court, Judy stated:

"What I understand that statute [§ 35–50–2–9] to mean is that the Indiana Supreme Court has to review the case. It's not saying that a brief has to be filed on it or any motions filed or anything. Alright, that's final, there. The Indiana Supreme Court can review the case, if they wish."

Waiver Hearing Transcript at 18–19. At another point, Judy told the Court that he understands his constitutional rights; in fact, he feels he understands his rights more than other laymen understand them. Waiver Hearing Transcript at 14. The Court explained to Judy that, by waiving his appeal, his convictions would not be reviewed for legal errors, and that the Court would accept that Judy is guilty of the crimes in question. Judy's overall attitude is best expressed by his response to that warning:

"I understand all that. It's, you know, the why, you know, of not going on with this appeal, it's within myself, you know. And there's really no—you know, I accepted what the court found. You know, I thought I was treated fair, more than fair. I was provided with good counsel and I lost. There's no sense going on with this."

Waiver Hearing Transcript at 10. Thus, Judy's attitude, in short, was that he would like to waive review of the sentence as well as review of the convictions; however, if this Court felt it had to review the sentence, he would accept that, but would take no action toward that review, preferring that it be done as soon as possible.

Before the hearing terminated, Judy stated in open court that he would like to formally fire attorneys Harris and Stroud, saying he no longer wished for them to represent him. Judy further stated that he had nothing against these two gentlemen; that they are the best attorneys he had ever seen, but that he wanted the sentence review to proceed with no further efforts on his behalf. Attorneys Stroud and Harris stated to the Court that they also understood that Judy did not want them to act in any way on his behalf, including the filing of any brief concerning the Court's review of the death sentence. This Court acknowledged Judy's dismissal of Harris and Stroud, and advised them that they were released from any further obligation with regard to the review process in his case.

We further find that Judy has made a knowing, voluntary, and intelligent waiver of his right to appeal his four murder convictions. In addition to all we see in the record, much of which having been discussed above, we have observed Judy's appearance and demeanor in this Court, his responsiveness to our questions, and his ability to communicate with his lawyers. We find him to be fully competent to make this waiver. *See Gilmore v. Utah, supra.* Accordingly, this Court will not evaluate

the murder convictions any further; we shall, then, proceed to review the death sentence imposed by the trial court.

## II.

█ Although we feel Steven Judy can waive and has waived review of any issue that might be raised with reference to his convictions, we believe that the death sentence cannot be imposed on anyone in this State until it has been reviewed by this Court and found to comport with the laws of this State and the principles of our state and federal constitutions. In conducting this review, we have an extensively charted course. In various ways, this issue has been reached in many jurisdictions, as well as our own, in recent years. The efforts of various legislatures and courts have culminated in a number of decisions by the United States Supreme Court that have set the standards and guidelines to be used in applying and reviewing a death sentence. Thus, it is our province here to review and assess the validity of our statutes, and their application in this case, under these controlling standards and guidelines.

Appellant Steven Judy was charged, tried, and convicted and sentenced to death under statutory provisions adopted by our legislature in 1977. Ind.Code § 35–42–1–1 (Burns 1979 Repl.) defines the crime of murder:

"A person who:

(1) Knowingly or intentionally kills another human being; or

(2) Kills another human being while committing or attempting to commit arson, burglary, child molesting, criminal deviate conduct, kidnapping, rape, or robbery; commits murder, a felony."

Judy was convicted for the murder of Terry Chasteen under subsection two of this statute, and for the murders of Misty Zollers, Stephen Chasteen and Mark Chasteen under subsection one.

In addition, § 35–50–2–3 establishes the sentencing alternatives for this crime:

"(a) A person who commits murder shall be imprisoned for a fixed term of forty years, with not more than twenty years added for aggravating circumstances or not more than ten years subtracted for mitigating circumstances; in addition, he may be fined not more than ten thousand dollars.

(b) Notwithstanding subsection (a) of this section, a person who commits murder may be sentenced to death under section nine [35–50–2–9] of this chapter."

Thus, by the plain language of this statute, the death penalty may not be imposed in mandatory fashion, and may only be imposed pursuant to established procedures set out elsewhere in the sentencing provisions.

Finally, § 35–50–2–9 establishes the procedure for the state to follow in seeking the death penalty, and provides the substantive standards to be applied and the procedural steps to be taken in determining the appropriateness of the death penalty in a given case. This section states:

"(a) The state may seek a death sentence for murder by alleging, on a page separate from the rest of the charging instrument, the existence of at least one of the aggravating circumstances listed in subsection (b) of this section. In the sentencing hearing after a person is convicted of murder, the state must prove beyond a reasonable doubt the existence of at least one of the aggravating circumstances alleged.

(b) The aggravating circumstances are as follows:

(1) The defendant committed the murder by intentionally killing the victim while committing or attempting to commit arson, burglary, child molesting, criminal deviate conduct, kidnapping, rape, or robbery.

(2) The defendant committed the murder by the unlawful detonation of an explosive with intent to injure person or damage property.

(3) The defendant committed the murder by lying in wait.

(4) The defendant who committed the murder was hired to kill.

(5) The defendant committed the murder by hiring another person to kill.

(6) The victim of the murder was a corrections employee, fireman, judge, or law-enforcement officer, and either (i) the victim was acting in the course of duty or (ii) the murder was motivated by an act the victim performed while acting in the course of duty.

(7) The defendant has been convicted of another murder.

(8) The defendant has committed another murder, at any time, regardless of whether he has been convicted of that other murder.

(9) The defendant was under a sentence of life imprisonment at the time of the murder.

(c) The mitigating circumstances that may be considered under this section are as follows:

(1) The defendant has no significant history of prior criminal conduct.

(2) The defendant was under the influence of extreme mental or emotional disturbance when he committed the murder.

(3) The victim was a participant in, or consented to, the defendant's conduct.

(4) The defendant was an accomplice in a murder committed by another person, and the defendant's participation was relatively minor.

(5) The defendant acted under the substantial domination of another person.

(6) The defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired as a result of mental disease or defect or of intoxication.

(7) Any other circumstances appropriate for consideration.

(d) If the defendant was convicted of murder in a jury trial, the jury shall reconvene for the sentencing hearing; if the trial was to the court, or the judgment was entered on a guilty plea, the court alone shall conduct the sentencing hearing. The jury, or the court, may consider all the evidence introduced at the trial stage of the proceedings, together with new evidence presented at the sentencing hearing. The defendant may present any additional evidence relevant to:

(1) The aggravating circumstances alleged; or

(2) Any of the mitigating circumstances listed in subsection (c) of this section.

(e) If the hearing is by jury, the jury shall recommend to the court whether the death penalty should be imposed. The jury may recommend the death penalty only if it finds:

(1) That the state has proved beyond a reasonable doubt that at least one of the aggravating circumstances exists; and

(2) That any mitigating circumstances that exist are outweighed by the aggravating circumstance or circumstances. The court shall make the final determination of the sentence, after considering the jury's recommendation, and the sentence shall be based on the same standards that the jury was required to consider. The court is not bound by the jury's recommendation.

(f) If a jury is unable to agree on a sentence recommendation after reasonable deliberations, the court shall discharge the jury and proceed as if the hearing had been to the court alone.

(g) If the hearing is to the court alone, the court shall sentence the defendant to death only if it finds:

(1) That the state has proved beyond a reasonable doubt that at least one [1] of the aggravating circumstances exists; and

(2) That any mitigating circumstances that exist are outweighed by the aggravating circumstance or circumstances.

(h) A death sentence is subject to automatic review by the Supreme Court. The review, which shall be heard under rules adopted by the Supreme Court, shall be given priority over all other cases. The death sentence may not be executed until the Supreme Court has completed its review."

The statutory provisions were adopted by our legislature following several pronouncements by the United States Supreme Court.

*Gregg v. Georgia,* (1976) 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859; *Jurek v. Texas,* (1976) 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929; *Proffitt v. Texas,* (1976) 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913; *Roberts v. Louisiana,* (1976) 428 U.S. 325, 96 S.Ct. 3001, 49 L.Ed.2d 974; *Woodson v. North Carolina,* (1976) 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944; *Furman v. Georgia,* (1972) 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346. In *Furman,* the Court found the imposition of the death penalty in the cases before it to be unconstitutional, but did not delineate any standards for determining when it might possibly be constitutional. This Court, in *Adams v. State,* (1972) 259 Ind. 164, 165, 284 N.E.2d 757, 758 (opinion on rehearing), found that the pronouncements of *Furman v. Georgia* left the constitutionality of our statutes and procedures uncertain; thus, it was necessary to set aside the death penalty in that case. In fact, we quoted in *Adams* from Chief Justice Burger's separate opinion in *Furman:* "Since there is no majority of the Court on the ultimate issue presented in these cases, the future of capital punishment in this country has been left in an uncertain limbo." *Furman v. Georgia, supra,* 408 U.S. at 403, 92 S.Ct. at 2811, 33 L.Ed.2d at 444 (Burger, C. J., dissenting).

In 1973, Indiana adopted a new murder statute, Ind. Code § 35–13–4–1 (Burns 1975), that provided for mandatory death sentences for specified types of murder. The validity of imposing the death sentence under this statute was presented to this Court in *French v. State,* (1977) 266 Ind. 276, 362 N.E.2d 834. We found in *French* that our statute was very similar to the statute struck down in *Woodson v. North Carolina,* (1976) 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944. The United States Supreme Court found the North Carolina statute to be constitutionally deficient because it provided for a mandatory death penalty. The Court held that the mandatory nature of the statute departed markedly from contemporary standards with respect to the imposition of the punishment of death, and was therefore contrary to the Eighth and Fourteenth Amendments' requirement that

the states' power to punish "be exercised within the limits of civilized standards." 428 U.S. at 301, 96 S.Ct. at 2989, 49 L.Ed.2d at 959 (*quoting Trop v. Dulles,* (1958) 356 U.S. 86, 100, 78 S.Ct. 590, 598, 2 L.Ed.2d 630, 642 (plurality opinion)). Contrary to *Furman,* mandatory imposition of the death penalty under the North Carolina statute failed to provide the jury with objective standards to guide, regularize, and make rationally reviewable the process for imposing the death sentence. *Id.* at 302–03, 96 S.Ct. at 2990–91, 49 L.Ed.2d at 959–60. Finally, the North Carolina statute failed "to allow the particularized consideration of relevant aspects of the character and record of each convicted defendant before the imposition upon him of the sentence of death," contrary to the fundamental respect for humanity underlying the Eighth Amendment. *Id.* at 303–04, 96 S.Ct. at 2991, 49 L.Ed.2d at 960–61. Therefore, in *French,* we found the imposition of the death penalty to be unconstitutional. We further stated:

"[W]e do not see how this Court or a trial court could review and revise sentences of death in the absence of statutory procedures providing for the introduction of appropriate evidence on which to base such review. Second, we do not see it as the role of the judiciary to legislate the standards by which the death penalty should be applied. The establishment of such standards and the procedures by which evidence relevant to those standards and the individual accused would be made a part of court record, are tasks within the realm of the legislative branch."

*French v. State, supra,* 266 Ind. at 282–83, 362 N.E.2d at 838.

Thus, following the decisions in *Woodson v. North Carolina* and *French v. State,* we have set aside death sentences which were imposed under the statute struck down in the *French* case. *Bond v. State,* (1980) Ind., 403 N.E.2d 812; *Norton v. State,* (1980) Ind., 408 N.E.2d 514; *Fair v. State,* (1977) 266 Ind. 380, 364 N.E.2d 1007; *Gaddis v. State,* (1977) 267 Ind. 100, 368 N.E.2d 244;

*Lamar v. State*, (1977), 266 ·Ind. 689, 366 N.E.2d 652; *Murphy v. State*, (1977) 267 Ind. 184, 369 N.E.2d 411. Pursuant to the language of that statute and the result in *French*, we ordered a life sentence imposed in those cases. *Compare* Ind. Code § 35–13–4–1 (Burns 1975) *with* Ind. Code § 35–50–2–3 (Burns 1979 Repl.).

In *Bond v. State, supra*, which was tried under the statute at issue in *French*, the trial court attempted to conform the procedures of the trial to the standards provided for in *Gregg v. Georgia*, (1976) 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859, and *Proffitt v. Florida*, (1976) 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913 (discussed *infra*). The court tried the case in a bifurcated manner as to the guilt and sentencing phases, and also balanced the aggravating and mitigating factors found in the evidence, even though the statute in effect at the time the crime was committed, § 35–13–4–1, did not require these procedures. The State contended in *Bond* that since the standards of *Gregg* and *Proffit* were apparently followed, the unconstitutional features of § 35–13–4–1 addressed in *French v. State* were cured. Thus, the State argued, the imposition of the death sentence in that case would be constitutional. We held, however, that

> "[t]he death penalty may be imposed only where procedures are followed which guarantee due process. In the instant case, the statute under which the defendant was condemned to death contained no such procedural safeguards. The provision for death therefore was invalid and could not be rendered valid by judicially created innovation."

*Bond v. State, supra*, Ind., 403 N.E.2d at 816.

■ Here, then, for the first time, we review the imposition of the death penalty imposed under our present statute, Ind. Code § 35–50–2–9 (Burns 1979 Repl.). At the outset, we may dispose of the question of whether the imposition of capital punishment is prohibited by the Indiana Constitution. Article one, section eighteen of our constitution provides: "The penal code shall be founded on the principles of reformation and not of vindictive justice." As we stated in *French v. State, supra*: "This provision has been consistently interpreted by this Court not to prohibit capital punishment for the crime of first degree murder. *Adams v. State*, (1971) 259 Ind. 64, 271 N.E.2d 425, *rev'd in part on reh.*, (1972) 259 Ind. 164, 284 N.E.2d 757 (death sentence vacated); *Hawkins v. State*, (1941) 219 Ind. 116, 37 N.E.2d 79; *McCutcheon v. State*, (1927) 199 Ind. 247, 155 N.E. 544; *Driskill v. State*, (1855) 7 Ind. 338." 266 Ind. at 280, 362 N.E.2d at 837 . Citing the most recent pronouncements of the United States Supreme Court, we further noted in *French* that the death penalty is not unconstitutional per se as cruel and unusual punishment prohibited by the Eighth Amendment to the United States Constitution and article one, section sixteen of the Indiana Constitution. *Id.*, 266 Ind. at 279–80, 362 N.E.2d at 837.

■ In *Gregg v. Georgia*, (1976) 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859, *Jurek v. Texas*, (1976) 428 U.S. 262, 96 S.Ct. 2950, 49 L.Ed.2d 929, and *Proffitt v. Florida*, (1976) 428 U.S. 242, 96 S.Ct. 2960, 49 L.Ed.2d 913, the United States Supreme Court ruled on the death penalty statutes of Georgia, Texas and Florida, and found them to be constitutional. We note that our present statute is very similar to the statutes under consideration in those cases, and, in fact, is nearly identical to the Florida statute upheld in *Proffitt. See Proffitt v. Florida, supra*, 428 U.S. at 247–53, 96 S.Ct. at 2964–67, 49 L.Ed.2d at 920–23. *Compare* Ind. Code § 35–50–2–9 (Burns 1979 Repl.) *with* Fla. Stat.Ann. § 921.141 (Supp. 1976–77).

Clearly, imposition of the death sentence under our statute is based on the nature and circumstances of the crime and the character of the perpetrator being sentenced. The State's request for consideration of the imposition of the death penalty must be filed on a document separate from the charging instrument. In that separate count, the State must allege the existence of at least one of the aggravating circumstances listed in the statute. The sentenc-

ing hearing is bifurcated from the guilt-determination phase of the trial. § 35–50–2–9(a). Thus, the death penalty issue is not presented to the jury until after they have found the defendant guilty of the charged crime or crimes.

At the sentencing hearing, both parties may introduce evidence and make argument to the jury regarding aggravating and mitigating circumstances. § 35–50–2–9(a)–(d). The statute permits the jury to consider all the evidence introduced at the guilt determining phase of the proceeding, together with new evidence presented at the sentencing hearing. § 35–50–2–9(d). The prosecution may stand on the evidence presented at the trial phase, or may introduce further evidence to show the aggravating circumstance alleged under § 35–50–2–9(b). The defendant may present additional evidence relevant to the aggravating circumstances or any mitigating circumstances listed in subsection (c) of the statute. In addition, a plurality of the United States Supreme Court has held that the sentencer must be allowed to consider, as a mitigating factor, "any aspect of a defendant's character or record and any of the circumstances of the offense that the defendant proffers as a basis for a sentence less than death." *Lockett v. Ohio*, (1978) 438 U.S. 586, 604, 98 S.Ct. 2954, 2965, 57 L.Ed.2d 973, 990 (opinion of Burger, C. J.) (footnotes omitted). *See State v. McCormick*, (1979) Ind. 397 N.E.2d 276.

The statutory aggravating circumstances are as follows:

"(1) The defendant committed the murder by intentionally killing the victim while committing or attempting to commit arson, burglary, child molesting, criminal deviate conduct, kidnapping, rape, or robbery.

(2) The defendant committed the murder by the unlawful detonation of an explosive with intent to injure person or damage property.

(3) The defendant committed the murder by lying in wait.

(4) The defendant who committed the murder was hired to kill.

(5) The defendant committed the murder by hiring another person to kill.

(6) The victim of the murder was a corrections employee, fireman, judge, or law-enforcement officer, and either (i) the victim was acting in the course of duty or (ii) the murder was motivated by an act the victim performed while acting in the course of duty.

(7) The defendant has been convicted of another murder.

(8) The defendant has committed another murder, at any time, regardless of whether he has been convicted of that other murder.

(9) The defendant was under a sentence of life imprisonment at the time of the murder."

§ 35–50–2–9(b). *See State v. McCormick, supra.* The statute also lists the following mitigating circumstances:

"(1) The defendant has no significant history of prior criminal conduct.

(2) The defendant was under the influence of extreme mental or emotional disturbance when he committed the murder.

(3) The victim was a participant in, or consented to, the defendant's conduct.

(4) The defendant was an accomplice in a murder committed by another person, and the defendant's participation was relatively minor.

(5) The defendant acted under the substantial domination of another person.

(6) The defendant's capacity to appreciate the criminality of his conduct or to conform his conduct to the requirements of law was substantially impaired as a result of mental disease or defect or of intoxication.

(7) Any other circumstances appropriate for consideration."

§ 35–50–2–9(c). *See Lockett v. Ohio, supra.*

The jury may recommend the death penalty only if it unanimously finds beyond a reasonable doubt that at least one of the aggravating circumstances exists, and that the mitigating circumstances, if any, do not outweigh the aggravating circumstances. § 35–50–2–9(e). The jury's verdict on this

question is advisory only; the trial court makes the final determination of the sentence to be imposed. In deciding on the appropriate sentence, the court must consider the jury's recommendation, but must also base his decision on the same standards that the jury was required to consider. § 35–50–2–9(e). Thus, the trial court must also find beyond a reasonable doubt that at least one aggravating circumstance is present, and that any existing mitigating circumstances do not outweigh the aggravating circumstances. Finally, a sentence of death is subject to automatic, expedited review by this Court. § 35–50–2–9(h).

Thus, under our statute, just as under the Florida statute upheld in *Proffitt*, in order for a death sentence to be imposed, several procedural standards and guidelines must be met and followed. Where the case is tried to a jury, both statutes require: a conviction for murder; a bifurcated sentencing hearing; a finding that at least one of the statutory aggravating circumstances exists; a finding that any mitigating circumstances are outweighed by the aggravating circumstances; a jury recommendation concerning the imposition of the death penalty; a finding by the trial court that at least one statutory aggravating circumstance exists, and that the aggravating circumstance or circumstances outweigh the mitigating circumstances; and automatic review by the state Supreme Court. In addition, as noted above, our statute requires that the aggravating circumstance or circumstances be proved beyond a reasonable doubt.

Several other constitutional and legislative pronouncements, plus certain procedural rules promulgated by this Court, also provide direction and guidance in the disposition of death penalty cases at the trial and appellate levels. Under our constitution, the statutes enacted by our legislature, and the rules of this Court, the trial court's findings and conclusions regarding sentencing are required to be in writing and in the record for this Court's review. Article seven, section four of the Indiana Constitution provides this Court with the following authority: "The Supreme Court shall have in all appeals of criminal cases the power to review all questions of law and to review and revise the sentence imposed." In addition, this Court adopted the following rules for the appellate review of sentences, effective January 1, 1978:

"1. *Availability—Court.*

(1) Appellate review of the sentence imposed on any criminal defendant convicted after the effective date of this rule is available as this rule provides.

(2) Appellate review of sentences under this rule may not be initiated by the State.

(3) The Supreme court will review sentences imposed upon convictions appealable to that Court; the Court of Appeals will review sentences imposed upon convictions appealable to the Court of Appeals.

2. *Scope of Review.*

(1) The reviewing court will not revise a sentence authorized by statute except where such sentence is manifestly unreasonable in light of the nature of the offense and the character of the offender.

(2) A sentence is not manifestly unreasonable unless no reasonable person could find such sentence appropriate to the particular offense and offender for which such sentence was imposed."

Also in furtherance of our duties under the Indiana Constitution and legislative enactments, this Court has adopted a rule which gives this Court exclusive jurisdiction of criminal appeals from judgments or sentences imposing death, life imprisonment, or a minimum sentence of greater than ten years. Ind.R.App.P. 4(A)(7). Moreover, Indiana's general sentencing hearing statute requires, in all cases where there are aggravating circumstances present, that the sentencing judge include a statement of the reasons for selecting the sentence he imposes. This enactment, Ind. Code § 35–4.1–4–3 (Burns § 35–50–1A–3, 1979 Repl.), reads as follows:

"*Sentencing hearing in felony cases.—* Before sentencing a person for felony the court must conduct a hearing to consider

the facts and circumstances relevant to sentencing. The person is entitled to subpoena and call witnesses and otherwise to present information in his own behalf. The court shall make a record of the hearing, including:

(1) A transcript of the hearing;

(2) A copy of the presentence report; and

(3) If the court finds aggravating circumstances or mitigating circumstances, a statement of the court's reasons for selecting the sentence that it imposes."

Thus, the statute requires the sentencing authority—the trial court in this state—to include his reasons in the record for the sentence imposed, and, of course, this must be done in writing. Clearly, this requirement facilitates meaningful appellate review by this Court of the trial court's sentencing decision. *Proffitt v. Florida, supra. See Page v. State,* (1980) Ind., 410 N.E.2d 1304; *Brandon v. State,* (1976) 264 Ind. 177, 340 N.E.2d 756; *Love v. State,* (1971) 257 Ind. 57, 272 N.E.2d 456.

Our review of these various constitutional and statutory requirements and our rules satisfies us that our sentencing scheme passes constitutional muster. Under our procedure, the sentencing authority's discretion, as exercised by the jury *and* the trial court, "is guided and channeled by requiring examination of specific factors that argue in favor of or against imposition of the death penalty, thus eliminating total arbitrariness and capriciousness in its imposition." *Proffitt v. Florida, supra,* 428 U.S. at 258, 96 S.Ct. at 2969, 49 L.Ed.2d at 926. Significantly, in cases tried to a jury, the trial court may not simply rely solely on the jury's advice; rather, he must conduct this analysis independent of the evaluation and recommendation made by the jury. In this fashion, the trial court, as the actual sentencing authority, provides an additional safeguard against a death penalty recommendation which may have been prompted by improper factors. Of course, the trial court must analyze the case in the same independent manner if it is tried only to him.

Further, our scheme provides for a procedure which enables this Court to review the imposition of the death penalty to further safeguard against the influence of improper or prejudicial factors at the trial level, and to further determine that the elements of arbitrariness and capriciousness condemned by *Furman v. Georgia, supra,* were not present in the sentencing decision. With the above considerations and guidelines in mind, this Court can then meaningfully and systematically review each case in which capital punishment has been chosen, in light of other death penalty cases. Mandatory review by this Court, in each case, of the articulated reasons for imposing the death penalty, and the evidence supporting those reasons, assures "consistency, fairness, and rationality in the evenhanded operation" of the death penalty statute. *Proffitt v. Florida, supra,* 428 U.S. at 259–60, 96 S.Ct. at 2970, 49 L.Ed.2d at 927. *See Gregg v. Georgia,* (1976) 428 U.S. 153, 194–95, 96 S.Ct. 2909, 2935, 49 L.Ed.2d 859, 886–87. *Cf. Woodson v. North Carolina, supra; French v. State, supra.* The guidelines and procedures established by our constitution, statutes, and rules thus permit an "informed, focused, guided, and objective inquiry" by all concerned into the appropriateness of capital punishment in a given case. Therefore, we find our death sentencing procedures to be consistent and in full compliance with those required by the United States Supreme Court in *Gregg v. Georgia* and *Proffitt v. Florida,* and thus not violative of the Eighth and Fourteenth Amendments to the United States Constitution.

The procedure and guidelines of § 35–50–2–9 were properly followed in the trial court in this case. As recited above, the jury heard extensive and overwhelming evidence of Judy's guilt in the commission of these four murders and the manner in which they were perpetrated. Testimony from several expert psychiatric witnesses, when added to the testimony concerning all the other circumstances presented by lay witnesses, established that Judy was not

insane at the time of the commission of these crimes. The jury found Judy guilty of each of the four murders charged in the information.

The trial court then instructed the jury as to their duties in determining whether to recommend the death penalty. As we indicated in Issue I, the parties were given an opportunity in the sentencing hearing to present any evidence they wished; however, neither the State nor the defendant offered further evidence. In fact, Judy specifically ordered his counsel to refrain from doing so. Judy was, however, given an opportunity to speak in his own behalf, and he did address the court and jury to the extent that he wished. Both sides were offered an opportunity to argue to the jury concerning the evidence heard at the trial phase and the question of the appropriateness of imposing the death penalty in this case.

By an unanimous verdict submitted to the court in writing, the jury found beyond a reasonable doubt that two aggravating circumstances existed. The jury further found that no mitigating circumstances existed to outweigh those aggravating circumstances. Thus, for each conviction, the jury recommended to the trial court that the death penalty be imposed.

■ One of the aggravating circumstances found by the jury was that Judy intentionally killed one of the victims, Terry Chasteen, while committing or attempting to commit rape. This circumstance is specifically provided for in § 35–50–2–9(b)(1), and, in fact, the jury's finding was cast in the language of the statute. This jury had just found Judy guilty, in the trial phase, of murdering Terry Chasteen while in the perpetration of a rape, and that finding, of course, was made under the typical reasonable doubt standards. The circumstances of this killing, therefore, constituted a valid aggravating factor for the jury to consider in deciding to recommend the death penalty.

The jury also found a second aggravating circumstance: that Judy had "committed another murder, at any time, regardless of

whether he had has been convicted of that other murder." This, of course, was also a recitation of the statutory language of one of the aggravating circumstances, subsection (b)(8). This also was a valid aggravating circumstance for the jury to consider, because these four murders were all committed at virtually the same time and in conjunction with each other, and the jury had previously convicted Judy, as charged in the informations, of all four murders.

The interrelationship of these killings, and the coinciding convictions for each of those killings in the trial phase, clearly distinguish this case from the situation we considered in *State v. McCormick*, (1979) Ind., 397 N.E.2d 276. We held in *McCormick* that it would not be proper for the judge or jury to consider, as an aggravating circumstance under subsection (b)(8), that the defendant had committed another murder, where that other murder was not related to the principal charge that had been tried, and the defendant had not been convicted of that other murder. In this case, however, the facts clearly show multiple murders committed as part of one series of events, and the jury heard all of those facts and made its judgment of guilt of four charges of murder—based on those facts—in the guilt determining phase of the trial. We stated in *McCormick* that our holding there was "confined to those cases in which the murder alleged as an aggravating circumstance is not related to the principal murder charge." *Id.*, 397 N.E.2d at 281. As the jury here considered the sentence to be imposed on Judy for each of the four murders, they had before them their own finding of guilt beyond a reasonable doubt of the other three murders involved in the entire incident. Therefore, they could properly consider these convictions as aggravating circumstances in deciding to recommend the death penalty. *See* § 35–50–2–9(d).

■ The defendant presented no evidence of mitigating circumstances at the sentencing hearing; in fact, Judy personally advised the jury that no such mitigating factors were available for their consideration. As we noted above, the defendant

was given every opportunity to introduce relevant evidence and make argument on the question of mitigating circumstances. Thus, the jury was justified in finding that no mitigating circumstances existed which would outweigh the aggravating circumstances they had found to exist beyond a reasonable doubt.

■ After receiving the jury's sentencing recommendation, the trial court ordered a presentence report to be prepared by the probation department. This report was prepared and filed in writing with the court. The prosecution and the defendant were given an opportunity to examine the presentence report, and both sides stated in open court at the time of sentencing that they had seen the report and had no corrections or objections to make as to its contents. The trial court discussed the report's contents with the parties and gave them an opportunity to offer evidence concerning the statements contained in the report. Both parties declined. The presentence report showed Judy's frequent involvement in criminal activity for a long period of time. Much of that activity involved extremely violent behavior.

The transcript of the sentencing hearing before the judge shows that he considered and found to exist the same aggravating circumstances the jury had found after hearing all the evidence. The court found that Judy intentionally killed Terry Chasteen while committing or attempting to commit rape upon her, and that Judy intentionally killed Terry Chasteen's three children. The trial judge also considered possible mitigating circumstances which might have balanced against or outweighed those aggravating circumstances. The court found that no mitigating circumstances existed, and discussed this finding at length with both parties. In reaching this conclusion, the judge specifically found that the evidence showed that none of the six enumerated mitigating circumstances of subsection (c) were present, and further found that there were no other mitigating circumstances which would in any way balance against the aggravating circumstances of these crimes.

We also have before us the written findings and conclusions of the trial judge, in which he makes all of these findings, pursuant to the statute and pursuant to our rules. The trial court's written findings list the aggravating circumstances that the jury and the court had previously found. His written findings also reveal close scrutiny of the particular features of these murders and of Judy's lengthy history of criminal behavior. The court found that Judy fully intended to commit the murders, that he was not provoked in any manner, that he "contemplated his course of conduct and chose it consciously without impairment, without excuse or justification," and that his conduct and attitude after the incident remained consistent with the intent shown before and during the murders. In reviewing Judy's past, the court found that Judy has consistently refused to accept responsibility for his various criminal acts, and has shifted the blame and responsibility to others for acts which were solely his doing. The court also found that Judy's victims generally have been particularly defenseless, and noted that three of the four victims in this case were very young children. Thus, the trial court could find nothing in the circumstances of these crimes or the characteristics of this defendant which mitigated against the strong aggravating circumstances of this case. From these findings, the trial court concluded that the death penalty should be imposed for each of these four murders.

We note here that the court's written findings and conclusions did not initially appear in the record. Due to the unusual manner in which this case was presented to us, this fact was not discovered until after this Court's review process had begun. Upon discovering this deletion, we issued a writ of certiorari to the trial court, ordering him to furnish us with his written findings and conclusions, if, in fact, he had made them, and to enter them of record in writing if he had not yet done so. The court was also ordered to furnish these written findings and conclusions to us to facilitate

our review of the case. Accordingly, the trial court has taken all of these steps, and we conclude his findings and conclusions comport with the pronouncements of *Gregg v. Georgia, supra, Proffitt v. Florida, supra,* and *Furman v. Georgia, supra.*

We further find, as explained above, that the trial court in all respects properly followed the required procedures in imposing the sentence of death. There was more than ample evidence in the record to justify the trial court's determination beyond a reasonable doubt that the aggravating circumstances set out in his findings were present. The facts in evidence before the court, together with those presented in the presentence report, also completely substantiate the court's finding that no mitigating circumstances existed which outweighed the aggravating circumstances. Both of these conclusions, and the specific findings to support them, were clearly enunciated in writing by the trial court. The facts evident in the record of this case, which patently show the egregious and horrifying nature of these offenses and the character of this offender, and the trial court's careful compliance with the proper procedures, inescapably lead us to the conclusion that the sentence of death recommended by the jury and imposed by the trial court was not arbitrarily or capriciously arrived at, and, without any doubt, is reasonable and appropriate.

Therefore, we affirm the trial court in its imposition of the death penalty here. This cause is remanded to the trial court for the purpose of setting a date for the death sentence to be carried out.

GIVAN, C. J., and HUNTER, J., concur.

PRENTICE, J., concurs in result with separate opinion.

DeBRULER, J., dissents with opinion.

PRENTICE, Justice, concurring in result.

I concur in the result, and I agree that the death sentence is lawful and reasonable in this case.

Our statutes and rules appear to give reasonable assurance that the death penalty cannot be arbitrarily and capriciously inflicted and thus to comport to the requirements of those recent decisions of the Supreme Court of the United States cited in the majority opinion and upholding the death penalty laws of several of our sister states. There are some differences, however, between the provisions of our laws and those there approved. It should be noted that the effect of those differences, and hence the constitutionality of our procedures, has not been adversarily tested. That testing has been waived in this case.

DeBRULER, Justice, dissenting.

The people address this Court from the past and in the present by several means. They do so through statutes, such as those making up the criminal code, including the death penalty statute before us, recently enacted by elected representatives in the Legislature. They also do so through the provisions of the Indiana Constitution which was drafted long ago by a convention and ratified by popular vote. The Constitution establishes the framework for the government and its relationship to the citizenry, draws its force from the direct ratification of it by popular vote, and takes precedence over statutes contrary to it. Our Indiana Constitution in the Bill of Rights contains the following provision:

"The penal code shall be founded on the principles of reformation and not of vindictive justice." Article 1, § 18.

This Court has recently considered whether this provision is an obstacle to the enactment of the death penalty and concluded that it was not. *Adams v. State,* (1971) 259 Ind. 64, 271 N.E.2d 425. That position was adopted by a three to two margin. In that case I argued in dissent at length in support of a construction that would withhold the power of the Legislature to provide for capital punishment. (See Appendix A) The majority was terse in its contrary holding on this point. (See Appendix B) It is the first principle of constitutional construction and our sworn duty not to rewrite

or amend the Constitution, but to read it to effectuate the intent and purposes of the Framers. *Bell v. Maryland*, (1964) 378 U.S. 226, 84 S.Ct. 1814, 12 L.Ed.2d 822. (Concurring opinion of Goldberg, J.) In so doing provisions must be read not as "legislative codes which are subject to continuous revisions with the changing course of events, but as the revelation of the great purposes which were intended to be achieved by the Constitution as a continuing instrument of government." *United States v. Classic*, 313 U.S. 299, 316, 61 S.Ct. 1031, 1038, 85 L.Ed. 1368. In determining the meaning of the Constitution we have held fast to the guiding propositions that "the words used in the Constitution must be presumed to have been carefully chosen so that each word would have a meaning", and that "each word must be thought of as having been deliberately selected and intentionally placed as though it had been hammered into the instrument." *Chadwick v. City of Crawfordsville*, (1940) 216 Ind. 399, 24 N.E.2d 937.

Ordinarily I would consider myself to be bound through the principle of *stare decisis* and would uphold this statute in an instance such as this as consistent with Art. 1, § 18. But as Justice Frankfurter aptly stated:

"*stare decisis* is a principle of policy and not a mechanical formula of adherence to the latest decision, however recent and questionable, when adherence involves collision with prior doctrine more embracing in its scope, intrinsically sounder, and verified by experience." *Helvering v. Hallock*, (1940) 309 U.S. 106, 60 S.Ct. 444, 451, 84 L.Ed. 605.

Since considering this question in the *Adams* case, substantial views have surfaced which bear directly upon the proper understanding and applications of Art. 1, § 18, in relation to the penalty of death. This matter has given an added perspective to the penalty of death which placed it again and anew upon a collision course with that state constitutional provision and calls for reconsideration. I do not therefore deem myself constricted by *stare decisis*.

The new matter to which I refer has arisen as the United States Supreme Court has considered the constitutionality of the death penalty. In *Gregg v. Georgia*, (1976) 428 U.S. 153, 96 S.Ct. 2909, 49 L.Ed.2d 859, Justice Stewart on behalf of himself and Justices Powell and Stevens states:

"In part, capital punishment is an expression of society's moral outrage at particularly offensive conduct. This function may be unappealing to many, but it is essential in an ordered society that asks its citizens to rely on legal processes rather than self-help to vindicate their wrongs.

'The instinct for retribution is part of the nature of man, and channeling that instinct in the administration of criminal justice serves an important purpose in promoting the stability of a society governed by law. When people begin to believe that organized society is unwilling or unable to impose upon criminal offenders the punishment they "deserve", then there are sown the seeds of anarchy—of self-help, vigilante justice, and lynch law.' *Furman v. Georgia*, supra, 408 U.S., at 308, 92 S.Ct., at 2761 [33 L.Ed.2d 346] (Stewart, J., concurring).

" 'Retribution is no longer the dominant objective of the criminal law,' *Williams v. New York*, 337 U.S. 241, 248, 69 S.Ct. 1079, 1084, 93 L.Ed. 1337 (1949), but neither is it a forbidden objective nor one inconsistent with our respect for the dignity of men. *Furman v. Georgia*, 408 U.S., at 394–395, 92 S.Ct., at 2806–2807 (Burger, C. J., dissenting); id., at 452–454, 92 S.Ct., at 2835–2836 (Powell, J., dissenting); *Powell v. Texas*, 392 U.S., at 531, 535–536, 88 S.Ct., at 2153, 2155–2156 [20 L.Ed.2d 1254] (plurality opinion). Indeed, the decision that capital punishment may be the appropriate sanction in extreme cases is an expression of the community's belief that certain crimes are themselves so grievous an affront to humanity that the only adequate response may be the penalty of death."

The view espoused here is that in addition to having a deterrent objective, the death

penalty has another objective which at once is separate, identifiable, and real. It is a retributive, vengeful, and thus vindictive one. Justices White, Rehnquist and the Chief Justice go even further. Concurring in the judgment in *Gregg*, they refer to reasons appearing in dissent in *Roberts v. Louisiana*, (1976) 428 U.S. 325, 96 S.Ct. 3001, 49 L.Ed.2d 974, which include the idea that life imprisonment may be inadequate "to satisfy the need for reprobation or retribution." At 3015. By adding the concept of reprobation in this context I take them to mean that the death penalty is applied when a life can be declared totally without worth. So viewed, the biological death of the wrongdoer by law is the culmination of a process which has as one of its steps the determination that an extant human life is totally valueless. Justice Blackmun, concurring, refers to his joining in Justice Powell's dissent in *Furman v. Georgia*, (1972) 408 U.S. 238, 92 S.Ct. 2726, 33 L.Ed.2d 346, in which Justice Powell notes that retribution is not impermissible. Both Justices Marshall and Brennan in dissent in *Gregg* express the belief that one of the principal purposes served by the death penalty is retribution. The new matter then to which I have alluded is the published fact that all nine justices of the highest court of the land believe that the death penalty is in part vindictive. Seven justices believe that this vindictive principle is consistent with the respect for the dignity of man in the Eighth Amendment, while the remaining two believe that it is not.

No Justice of this Court is bound to accept the characterization of the purposes of the death penalty or the principles underlying it to which the Justices of the United States Supreme Court ascribe. However, their unanimous view, arising as it does in cases involving a very basic issue and calling out visceral individual responses, is entitled to substantial weight. Adventitiously those responses support the views I previously expressed in dissent in *Adams*, and as complementary to those views leads me anew to the firm belief that Art. 1, § 18, must be removed from the Constitution, if Indiana is to have the death penalty. A

form of constitutional amendment tracking a similar provision which was in the Montana Constitution from 1889 to 1972 would suffice to accomplish this purpose. Article III, § 24 of the Montana Constitution of 1889 reads as follows:

"Laws for the punishment of crime shall be founded on the principles of reformation and prevention, *but this shall not affect the power of the legislative assembly to provide for punishing offenses by death.*" (emphasis added)

One can agree that the vindictive, retributive and reprobative objective of the death penalty is not inconsistent with the respect for the dignity of man encompassed within the prohibitions of our constitutions against cruel or unusual punishments, however, one cannot rationally accept the proposition that this objective is consistent with the mandate of Art. 1, § 18. In bringing forth the meaning of this provision of the Constitution the words of it are to be taken in their natural and ordinary sense. *Benton County Council v. State ex rel. Sparks*, (1946) 224 Ind. 114, 65 N.E.2d 116. The language of this provision is straightforward. We need not stray far from it. Its plain meaning is that principles of reformation must underpin the establishment of criminal penalties to the exclusion of principles of vindictive justice. The death penalty rests upon a foundation which is partially vindictive and is the product of principles of vindictive justice. It is based upon the almost universal and understandable human revulsion to particularly heinous and atrocious crimes and the judgmental response which very often follows closely that the perpetrators of such crimes *deserve* to be put to death. It is based upon the judgment that there are persons who have conducted themselves in such a dangerous and reprehensible manner and are of such an ungovernable nature that their life is totally worthless. The Indiana Constitution in Art. 1, § 18 bars the State of Indiana from permitting this instinct of man for vengeance and retribution from manifesting itself in the establishment and formulation of criminal penalties.

It was said in the majority opinion in *Adams v. State, supra,* and in previous opinions of this Court as well responding to this issue that the purpose of all punishment is the protection of society. This response misses the mark. The core point of Article 1, § 18 is that society may indeed protect itself through the enactment and enforcement of penal sanctions, but that it nevertheless may not go so far in accomplishing that important and necessary objective as to satisfy the longing and need of the community for revenge and retribution against a wrongdoer. This I believe to be the purpose of Article 1, § 18, and I deem myself as a judge, bound to honor it. I would therefore remand this case with instructions to impose determinate sentences.

## APPENDIX A

Whatever may be the case in other jurisdictions, in Indiana the Constitution explicitly sets out that at least one of the functions of punishment must be to reform the offender and that function is absolutely incompatible with the death penalty.

In spite of the obvious, clear meaning of § 18, this Court has in the past upheld the validity of the death penalty. *Hawkins v. State* (1941), 219 Ind. 116, 37 N.E.2d 79; *McCutcheon v. State* (1927), 199 Ind. 247, 155 N.E. 544; *Rice v. State* (1855), 7 Ind. 332; *Driskill v. State* (1855), 7 Ind. 338. The rationale of this position was set out in *Driskill* and *Rice,* and subsequent cases have added nothing to the discussion.

In *Driskill,* this Court said:

"In connection with this point, it is insisted that the law authorizing the death penalty is in conflict with section eighteen of the bill of rights, which requires the penal code to be founded on principles of reformation, and not of vindictive justice. *The punishment of death for murder in the first degree, is not, in our opinion, vindictive, but is even-handed justice.* There is, indeed, nothing vindictive in our penal laws. *The main object of all punishment is the protection of society.* With that end in view, the legislature have, in a given case, left it within the discretion of the jury to say when the death penalty shall be inflicted. *It is true, one branch of that discretion does not contemplate reform; still, it is the only instance in the law in which the purpose of reformation is not prominent, and it cannot, it seems to us, be allowed to give character to the principles upon which the entire code is founded.* The eighteenth section of the bill of rights, when properly construed, requires the penal laws to be so framed as to protect society, and at the same time, *as a system, to inculcate the principle of reform.* In this view, the present code is, no doubt, founded on the principles of reformation, within the spirit and intent of the constitution. The law which allows the death penalty to be inflicted, must, therefore, be held valid." (Emphasis added.) 7 Ind. at 342, 343.

In *Rice* this Court said:

"It is also decided in *Driskill v. State, infra,* that the death penalty is not in conflict with the 18th section of the first article of our constitution. If any question can be raised before the judiciary upon the discretion of the legislature under that section, we concur that it has not been abused in leaving the question of assessing that penalty to the jury. *There are cases beyond the hope of reformation—criminals whose necks have become so hardened 'that they should suddenly be cut off, and that without remedy.'*" (Emphasis added.) 7 Ind. at 338.

In the above quotations the Court made several attempts to justify its conclusion that § 18 is no obstacle to the enactment of the death penalty provision by the Legislature. I believe the arguments fail to support that conclusion.

First, the Court stated baldly that the death penalty is not vindictive in nature but is "even-handed justice". This has no determinable meaning. It might mean that the death penalty is an option which the sentencing authority may choose in *all* first degree murder cases. As such it is true but beside the point. It might mean that the death penalty is not vindictive because it is

the taking of the life of the offender who has himself taken a life. This would be the same as claiming that the "eye for an eye" philosophy is not vindictive, when in fact it is the epitome of vindictiveness and revengefulness. The exclusive use of the "eye for an eye" philosophy is precisely what is precluded by § 18. Whatever it might have meant to the judge who wrote it, this statement that the death penalty is even-handed justice is not an argument at all, and does not succeed in establishing that the death penalty is not vindictive.

Second, the Court said that the "main object of all punishment is the protection of society". Although this is not stated in the Constitution and the Court does not indicate any constitutional basis for the claim, I assume it to be one of the basic objectives of the penal system. However, the need to protect society does not require the death penalty, and there is no reason to adopt this objective to the *exclusion* of the principle embodied in § 18. If possible we must try to give effect to *both* objectives of the criminal sanction. This is easily done because there is nothing in § 18 that is incompatible with the objective of protecting society. *Section 18 merely precludes a penalty which forecloses all possibility of reformation of the offender.* Life imprisonment as a maximum penalty accomplishes both goals and there is no need to choose between them; but the death penalty defeats one of them, the only one specifically set out in the Constitution.

Third, the Court said the requirement that the "penal code" be founded on the principles of reformation did not apply to each and every criminal statute, but merely applies to the entire system, and one instance, where admittedly the penalty does not contemplate reform, does not make the whole system vindictive in violation of § 18. I see no reason to interpret § 18 in this way. The "penal code" is made up of each and every legislative enactment which defines a crime and provides a penalty for a violation thereof; it is the class of all criminal statutes and it is they which must be founded on principles of reformation. The language of § 18 does not indicate any exceptions and the Court offers no valid reason to accept any. The fact recognized by the Court in *Driskill*, that the death penalty "is the only instance in the law in which the purpose of reformation is not prominent" does not support the argument that the death penalty is constitutional, but on the contrary clearly demonstrates that it is a lone anomaly among the penal laws and that it is at odds with the rest of the body of penal laws and that it is unconstitutional.

Fourth, the Court seemed to rely on the fact that the sentencing authority has the discretionary power in a first degree murder case to impose a penalty of life imprisonment rather than death if it so chooses. Presumably they thought that the existence of this power renders the penalty provision nonvindictive and in conformance with principles of reformation, and, therefore, not in violation of § 18. In my view the power of the sentencing authority to select life imprisonment rather than death does not render the penalty provision constitutional under § 18. The question is, when the death penalty is in fact chosen, is § 18 satisfied? Section 18 means that the sentence *actually imposed* must leave open the possibility of reformation of the offender. This is not satisfied by the existence of a *potential* sentence of life imprisonment.

Fifth, in the *Rice* case, the Court states its firm opinion that those offenders who had been assessed the death penalty were beyond any hope of reformation and, therefore, the principles of reformation did not need to be considered in a death case. I believe this position is erroneous for two reasons: (1) The concept of human nature implicit in § 18 is one which says that every man, no matter how depraved, has the possibility of redemption for his evil ways through a change of heart. Who are we to say any man's heart is hardened beyond any hope of change? (2) There are no grounds for believing that those persons who receive the death penalty are in fact beyond hope of reformation since the sentencing authority is not required to find that the defendant is non-reformable before assessing the death penalty. The Court is merely saying

that the imposition of the death penalty is justified because the offender is non-reformable, and we know he is non-reformable because he has received the death penalty.

I would hold that the mandate of § 18 clearly prohibits the death penalty and that no Indiana case has even begun to offer a good counter argument to that position.

## APPENDIX B

Likewise appellant's contention that the death penalty as punishment for the crime of first degree murder is a "vindictive justice" is also without merit. In *Driskill v. State* (1855), 7 Ind. 338, 343, this court stated:

> "The punishment of death for murder in the first degree, is not, in our opinion, vindictive, but is even-handed justice. There is, indeed, nothing vindictive in our penal laws. The main object of all punishment is the protection of society."

For the reasons stated we are bound by legislative policy and historical rationale, therefore, the appellant's contention as to the death penalty must fail.